# EXHIBIT E

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I.    CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE <u>SEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>VOLUSIA</u>   COUNTY, FLORIDA

<u>Brown and Brown Insurance Services Inc</u>
Plaintiff                                              Case # _____
                                                       Judge  _____

vs.

<u>Legacy Insurance Group LLC, Legacy Insurance Group 3 LLC, Nathan Gilbert Insurance Agency,</u>
<u>Swenson Insurance Group, Swenson Capital LLC, Westyn Swenson</u>
  Defendant

**II.    AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☒ $50,001- $75,000
☐ $75,001 - $100,000
☐ over $100,000.00

**III.    TYPE OF CASE**    (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
       ☐ Business governance
       ☐ Business torts
       ☐ Environmental/Toxic tort
       ☐ Third party indemnification
       ☐ Construction defect
       ☐ Mass tort
       ☐ Negligent security
       ☐ Nursing home negligence
       ☐ Premises liability—commercial
       ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
       ☐ Commercial foreclosure
       ☐ Homestead residential foreclosure
       ☐ Non-homestead residential foreclosure
       ☐ Other real property actions

☐Professional malpractice
       ☐ Malpractice—business
       ☐ Malpractice—medical
       ☐ Malpractice—other professional
☐ Other
       ☐ Antitrust/Trade regulation
       ☐ Business transactions
       ☐ Constitutional challenge—statute or ordinance
       ☐ Constitutional challenge—proposed amendment
       ☐ Corporate trusts
       ☐ Discrimination—employment or other
       ☐ Insurance claims
       ☐ Intellectual property
       ☐ Libel/Slander
       ☐ Shareholder derivative action
       ☐ Securities litigation
       ☐ Trade secrets
       ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
   ☐ Residential Evictions
   ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.    REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.    NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

  4

**VI.    IS THIS CASE A CLASS ACTION LAWSUIT?**
   ☐ yes
   ☒ no

**VII.    HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
   ☒ no
   ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.    IS JURY TRIAL DEMANDED IN COMPLAINT?**
   ☐ yes
   ☒ no

**IX.    DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
   ☐ yes
   ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Christopher Pardo      Fla. Bar # 41824
    Attorney or party           (Bar # if attorney)

Christopher Pardo        11/15/2024
 (type or print name)       Date

- 3 -



**LAURA E. ROTH**
CLERK OF THE CIRCUIT COURT

SEVENTH JUDICIAL CIRCUIT - VOLUSIA  COUNTY
P.O. BOX 6043 DELAND, FLORIDA 32721-6043 · WWW.CLERK.ORG

Filing #: ▉▉▉▉▉▉▉
Filer:Christopher Pardo
Payment:$462.50

1 Filing Fee: $400.00
2 Defendants greater than 5: $2.50
3 Summons Issuance: $60.00
4 Complaints/Petitions Complaint: $0.00

*This document is a Clerk generated receipt.  This  page was not included in the original court
document submitted by the filer.*

IN THE CIRCUIT COURT OF THE 7TH JUDICIAL CIRCUIT IN AND FOR VOLUSIA COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. _____

BROWN & BROWN INSURANCE SERVICES, INC.,

        Plaintiff,

    v.

LEGACY INSURANCE GROUP, LLC,
LEGACY INSURANCE GROUP 3.0, LLC,
NATHAN GILBERT INSURANCE AGENCY,
SWENSON INSURANCE GROUP, SWENSON
CAPITAL LLC, and WESTYN SWENSON,

        Defendants.

_____/

## COMPLAINT

Plaintiff Brown & Brown Insurance Services, Inc. ("Brown & Brown" or "Plaintiff"), by and through its attorneys, Hunton Andrews Kurth LLP, hereby file this Complaint against Defendants Legacy Insurance Group, LLC, Legacy Insurance Group 3.0, LLC, and Nathan Gilbert Insurance Agency ("Gilbert") (together, the "Legacy Defendants"), and Swenson Insurance Group, Swenson Capital, LLC, and Westyn Swenson ("Swenson"), (Swenson Insurance Group and Swenson Capital together with Swenson, the "Swenson Defendants"), (Legacy Defendants collectively with Swenson Defendants, the "Defendants").

## INTRODUCTION

1.    Shortly after Westyn Swenson executed his employment agreement with Brown & Brown, both he and each of the Defendants began a knowing, systematic and willful campaign to violate the valid and enforceable restrictive covenants contained therein, including non-

1

acceptance, non-solicitation and confidentiality provisions, which in the case of the Legacy Defendants, amounts to tortious interference with contract. All Defendants have also tortiously interfered with Plaintiff's prospective business relations.

## NATURE OF THE ACTION

2.    In this action for breach of restrictive covenants, Plaintiff seeks damages and injunctive relief arising out of Swenson's intentional breaches of his contractual and other obligations to Brown & Brown, and further seek damages arising out of the Legacy Defendants and Swenson Defendants' tortious interference with Swenson's contractual and other obligations to Brown & Brown.

3.    From approximately February 2021 until March 1, 2024, Swenson was employed by Hillco West Texas, LLC ("Hillco").[1]

4.    On or about February 26, 2021, Swenson entered into an employment agreement with Hillco ("First Hillco Agreement"), in which he agreed not to solicit Hillco's customers. *See* First Hillco Agreement, attached as Exhibit A, § 12.

5.    On November 16, 2023, Swenson was provided with a new agreement ("Second Hillco Agreement") providing him with a more favorable commission split.

6.    Accordingly, Swenson covenanted not to take any book of business away from Hillco, solicit Hillco's customers, or compete with Hillco in any territory in which Hillco conducted business following the termination of, or during, his employment with Hillco. *See* Second Hillco Agreement, attached as Exhibit B, at §§ 3, 5, 10-11.

---

[1] Following an asset purchase agreement by Brown & Brown, Hillco currently exists as HHill Holdings 1 LLC, HHill Holdings 2 LLC, and HHill Holdings 3 LLC. These entities' owner, Hunter Hill, is a Brown & Brown employee.

7.      Despite the First and Second Hillco Agreements, Swenson secretly formed a company named Swenson Capital LLC on or about May 31, 2022, of which he is purportedly the sole member and organizer.  *See* Swenson Capital LLC Certificate of Formation, attached as Exhibit C.

8.      Upon information and belief, Swenson Capital LLC was founded for the purpose of competing with Hillco while still employed thereby.

9.      Effective on or about March 1, 2024, Brown & Brown acquired the majority of Hillco's assets.

10.     At the same time, Swenson signed a new employment agreement with Brown & Brown (the "Agreement"), thereby becoming a Vice President of Sales for Brown & Brown, a Florida company based in Daytona Beach. *See* Agreement, attached as Exhibit D.

11.     In his roles on behalf of both Brown & Brown and Hillco, Swenson was responsible for quoting, placing, providing, servicing and/or renewing insurance products or services and prospecting new business.

12.     As Vice President of Sales, Swenson was entrusted with Brown & Brown's confidential customer and business information.

13.     Upon information and belief, shortly after beginning work with Brown & Brown, Swenson began conspiring with the Legacy Defendants, including Matthew Cooper ("Cooper"), to poach the Plaintiff's customer accounts and employees.

14.     Upon information and belief, this conspiracy included discussion of how the Defendants could use Swenson Capital LLC as a smokescreen for their business relationship.

15.     On or about June 24, 2024, just months after joining Brown & Brown, Swenson resigned from the Plaintiff's employ.

16.     Upon information and belief, Swenson immediately commenced work with the Legacy Defendants.

17.     On July 29, 2024, Brown & Brown sent a letter to the Legacy Defendants regarding Cooper's restrictive covenants, as set forth in his separate agreement with Brown & Brown, and including a copy of that agreement as an exhibit. *See* Cease & Desist Letter, attached as <u>Exhibit E</u>.

18.     Upon information and belief, the Legacy Defendants were aware that Swenson's Agreement, attached as <u>Exhibit C</u>, is substantially identical to Cooper's agreement with Brown & Brown.

19.     None of the Defendants provided any response to the Cease & Desist Letter.

20.     Moreover, upon information and belief, the Legacy Defendants were already aware, or at minimum, were then put on notice, of Cooper's contractual obligation not to have solicited Swenson to cease working for Brown &Brown and/or for Swenson to have commenced work with the Legacy Defendants.

21.     Further, upon information and belief, Cooper and Swenson discussed their contractual obligations during the period between Cooper's resignation on May 29, 2024 and Swenson's final date of providing services to Brown & Brown on June 28, 2024.

22.     Specifically, Cooper was tasked with transitioning his client accounts to Swenson upon his resignation, but while he still provided services to Brown & Brown.

23.     Upon information and belief, Swenson and Cooper conspired during this time to solicit Brown & Brown's customers on behalf of the Legacy Defendants.

24.     Accordingly, upon information and belief, the Legacy Defendants, Swenson, and Cooper likewise conspired together to create a new entity for Swenson to pretend to provide services for, all while secretly providing services to the Legacy Defendants.

25.    Specifically, on August 12, 2024, Swenson filed a Certificate of Formation for a new limited liability company, Swenson Insurance Group LLC, of which he is purportedly the sole member and organizer. *See* Swenson Insurance Group LLC Certificate of Formation, attached as Exhibit F.

26.    Swenson Insurance Group LLC's address is 4957 US 82 W, Nocona, Texas.

27.    The address at which Swenson Insurance Group LLC's operations are allegedly housed is essentially a vacant piece of land located along the side of a highway, approximately an hour away from Nathan Gilbert Insurance Agency. *Id.*

28.    The image of Swenson Insurance Group LLC's address, as shown in Google Maps, is captured below:



*See* Google Maps, Google Street View, Search: 4957 US 82 W, Nocona, Texas, 76255 https://www.google.com/maps/@▇▇▇▇-

▇▇▇▇3a,75y,165.18h,91.59t/data=!3m7!1e1!3m5!1sDfUpvtXuzubST0sEiFxErg!2e0!6shtt ps:%2F%2Fstreetviewpixels-pa.googleapis.com.

29.     Since beginning work with the Legacy Defendants under the guise of the Swenson Defendants, upon information and belief, Swenson has solicited and accepted work involving no less than thirty-seven customer insurance policies he had previously serviced on behalf of Brown & Brown, using misappropriated confidential information, to benefit the Legacy Defendants.

30.     Upon information and belief, Swenson has further violated contractual obligations owed to Plaintiff by improperly using and/or disclosing Brown & Brown's confidential customer and business information to the Legacy Defendants and/or Brown & Brown's current or former clients.

31.     The Defendants' actions have caused, and will continue to cause, the Plaintiff significant economic and non-monetary harm, which will continue unless they are enjoined from their ongoing unlawful conduct.

## PARTIES

32.     Brown & Brown is incorporated and maintains its principal place of business in Daytona Beach, Volusia County, Florida, from which it provides employees with numerous services and products, as detailed below.

33.     As a national supplier of insurance products and services based in Florida, Brown & Brown also transacts significant business in the state of Florida.

34.     Upon information and belief, Swenson is an adult resident of the state of Texas.

35.     Upon information and belief, Legacy Insurance Group, LLC, is a Florida Limited Liability Company with a principal place of business in Saint Johns, Florida.

36.     Upon information and belief, Legacy Insurance Group 3.0, LLC, is a Texas Limited Liability Company with a principal place of business in Childress, Texas, which has a direct business relationship with Legacy Insurance Group, LLC.

37.    Upon information and belief, Nathan Gilbert Insurance Group is a Texas Limited Liability Company with a principal place of business in Iowa Falls, Texas, and which also maintains a direct business relationship with Legacy Insurance Group, LLC, a Florida Limited Liability Company with a principal place of business in Saint Johns, Florida.

38.    Upon information and belief, Swenson Capital LLC and Swenson Insurance Group LLC are Texas Limited Liability Companies allegedly based in Iowa Park and Nocona, Texas, respectively.

39.    Upon information and belief,  Swenson Capital LLC and Swenson Insurance Group LLC are alter egos for Swenson.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

40.    This Court has jurisdiction over this matter because the Plaintiffs seeks damages in excess of $50,000.00, exclusive of attorneys' fees.

41.    The Defendants are subject to jurisdiction in Florida because they conduct business in in Florida, including Volusia County, Florida, and caused injury in Volusia County, Florida, including by misappropriating information which is located therein.

42.    Upon information and belief, each of the Defendants is an interrelated business entity which has, together with the others, conspired to commit unlawful conduct as set forth herein, including in Florida.

43.    All conditions precedent to the commencement or maintenance of the actions alleged have occurred or the occurrence of such has been waived by the Defendants' actions.

44.    The Plaintiff has performed all obligations under the contract alleged, or such performance has been waived by Swenson's breach of contractual or common law obligations.

45. The Plaintiff has retained the undersigned attorneys, are required to pay them a reasonable fee, and are entitled to recover a reasonable fee according to the Agreement and applicable law, including Section 542.335 of the Florida Statutes.

## FACTUAL ALLEGATIONS

### Plaintiff's Business

46. At all times relevant, the Plaintiff has been engaged in the business of quoting, placing, providing, servicing, and/or renewing insurance products.

47. The Plaintiff's business model relies upon salespeople such as Swenson to prospect and manage client relationships.

48. Accordingly, Swenson was given access to a considerable amount of confidential information and goodwill regarding the Plaintiff's customer accounts during the term of his employment.

49. Because Plaintiff sells directly to its customers, it views, *inter alia*, the names, price lists, profit margins, purchasing histories, and requirements of customers and potential customers and any hard or electronic documents that contain this information as confidential.

50. Brown & Brown's customer relationships were created and strengthened through significant capital and human investment.

51. Brown & Brown purchased certain of these client accounts and their associated confidential information—including client accounts associated with Swenson—from Hillco at great cost.

52. In addition, Brown & Brown provided access to other accounts and confidential information associated therewith directly to Swenson once he began working for Brown & Brown.

53.    Brown & Brown's successful product and service sales are based, in substantial part, on confidential, proprietary, and trade secret information developed and used by Brown & Brown, as well as trade secrets not disclosed to the general public or to Brown & Brown's competitors, making this information extremely valuable.

***Swenson's Employment with the Plaintiff***

54.    From February 26, 2021 to March 1, 2024, Swenson was employed by Hillco.

55.    In or about 2023, Hilllco began discussing the possibility of entering into an asset purchase agreements with Brown & Brown (the "APA").

56.    In or about February of 2024, Swenson and other key Hillco employees, including Cooper, traveled to Orlando, Florida in anticipation of becoming Brown & Brown employees.

57.    Effective March 1, 2024, Hillco entered into the APA with Brown & Brown.

58.    In accordance with the APA, Hillco, *inter alia*, agreed to assign its employees' restrictive covenants to Brown & Brown and to subsequently take all reasonable measures to enforce the terms of Hillco's restrictive covenants with its employees.

59.    On or about March 1, 2024, in conjunction with the sale of assets between Hillco and Brown & Brown, and his commencement of employment with Brown & Brown,  Swenson executed the Employment Agreement with Brown & Brown attached as Exhibit D, and thus became a Vice President of Sales for Brown & Brown.

60.    As a Brown & Brown employee, Swenson had access to trade secrets and confidential information which was subject to use in accordance with policies developed in Florida.

61.    Swenson was further subject to a reporting and strategic decision-making structure which included individuals based in Texas, Minnesota, and Florida.

62.    Swenson also gained the benefit of human resources, financial, accounting, tax, auditing, marketing, advertising, research, compliance, purchasing, procurement, databases, and systems, services, technologies, and networks which are based in Florida.

63.    Swenson's duties for, and obligations to, Brown & Brown encompassed, *e.g.*, quoting, recommending, placing, providing, servicing and renewing: (i) employer-sponsored benefits accounts with programs such as group life, health, dental, long-term care, and ancillary benefits; (ii) insurance procedure for individuals, such as life, health, annuities, long-term care, and ancillary benefits; (iii) services provided to clients directly or through third-party services providers relating to risk management, loss control, compliance, consulting, claims analysis, insurance program administration, enrollment services, COBRA, Section 125 Cafeteria Plan, Health Savings Account (HSA) Plans, Health Reimbursement Arrangement (HRA) Plans, Health Flexible Spending Account (FSA) Plans, and/or Premium Reimbursement Arrangement (PRA) Plans, including preparation, review, and/or filing of IRS Form 5500s, and referrals to on-site medical clinics, attorneys, or other third-party service providers; (iv) commercial or personal lines of property and casualty insurance products; and (v) commercial or individual bond or suretyship products.

64.    In order to fulfill his responsibilities to Brown & Brown, Swenson was entrusted with and had access to Brown & Brown's confidential, proprietary, and trade secret information, including financial information, sales information, sales and marketing strategy information, the identity and lists of actual and potential customers, profit margins, purchasing histories and requirements of customers and potential customers, marketing information, and other information regarding Brown & Brown's methods, processes, services, customers, operations and business,

and information regarding the insurance products required and/or preferred by various Brown & Brown customers.

65.    Swenson was advised of his responsibilities by Brown & Brown, such that he undoubtedly knew that this confidential information was not intended for dissemination.

66.    Swenson was entrusted with this confidential, proprietary, and trade secret information to create and strengthen customer relationships for Brown & Brown's benefit, and not for the benefit of Brown & Brown's competitors.

67.    From its headquarters in Florida, Brown & Brown took many steps to prevent the disclosure of its confidential, proprietary, and trade secret information to competitors and others, particularly during and after the course of the acquisition of Hillco's assets by Brown & Brown.

68.    Brown & Brown has promulgated numerous policies designed to protect this information, which are distributed to its employees.

69.    In addition, Brown & Brown employees receive training in information security, are reminded of these rules and policies, and must agree to comply with them every time the employee logs on to their computer.

70.    Moreover, Brown & Brown classifies its information based on its relative business value or sensitivity, and grants limited access to any information designated as confidential, proprietary, and/or trade secret information to employees who have a legitimate reason to access such information.

71.    In addition to these policies, Brown & Brown also requires employees to execute a written agreement providing, *inter alia*, for the protection and continued confidentiality of Brown & Brown's information and trade secrets, as well as Brown & Brown's goodwill, customer relationships and investment in its employees, during and after their employment.

72.    In Swenson's case, Brown & Brown required him to sign the Agreement before commencing work for Brown & Brown and thereby gaining access to its confidential and proprietary information, including those contained in its client databases and other servers, at least some of which are housed in Florida.

73.    The Agreement contains several restrictive covenants that, *inter alia*, prohibit Swenson from: (a) soliciting work from any of Brown & Brown's actual or prospective clients with which he had contact or regarding which he received confidential information during the two years prior to his the end of his employment with Brown & Brown (the "Restricted Accounts"); (b) accepting work from any of the Restricted Accounts or otherwise interfering or reducing in any manner with the business relationship between Brown & Brown and any Restricted Accounts; (c) misappropriating Brown & Brown's trade secrets or confidential information; (d) interfering or otherwise taking any action to cause any referral source, insurance carrier, wholesale broker, independent contract, or other person or entity with a business relationship with Brown & Brown to cease, reduce, or refrain from such business relationship; or (e) directly or indirectly inducing, soliciting, or attempting to influence any Brown & Brown employee to leave Brown & Brown, or otherwise assisting a competitor to hire such an employee. Exhibit D, § 6 (a-c).

74.    Furthermore, Swenson agreed to provide a thirty-day notice period prior to the final day of his employment with Brown & Brown (the "Termination Date"), and to return all Brown & Brown confidential and proprietary information and trade secrets upon the Termination Date or otherwise upon demand.  *Id.*, § 4(c).

75.     As set forth below, Brown & Brown is informed and believes that Swenson violated this thirty-day notice period upon his resignation by commencing work for the Legacy Defendants while still employed by Brown & Brown. *Id.*

76.     The primary purpose of the restrictive covenants contained in the Agreement is to reasonably protect Brown & Brown's legitimate business interests, including but not limited to: (a) the retention of Brown & Brown's clients; (b) the preservation of Brown & Brown's trade secrets and other confidential business information and proprietary information, including information used to assist in the retention of Brown & Brown's current clients, expand business with Brown & Brown's current clients, and secure prospective clients in the future; (c) the protection of Brown & Brown's investment (through Hillco) in training and enhancing Swenson's skill and experience; and (d) the protection of the goodwill Brown & Brown has created with its current clients and prospective future clients.

77.     Swenson freely and voluntarily entered into the Agreement, which is both valid and binding in that it: (a) is supported by adequate consideration; (b) does not impose any unreasonable economic hardships on Swenson; and (c) is not contrary to public policy.

78.     As a Vice President, Swenson had intimate knowledge of Brown & Brown's trade secrets and confidential and proprietary information, including without limitation: (a) sensitive customer and financial information; (b) strategic customer relationship management plans and processes; (c) sales territory designs, strategies and deployment; (d) customer buying patterns and preferences; (e) the identity and lists of actual and potential customers; (f) Brown & Brown's sales and marketing strategies for customers; and (g) specialized training and related material.

79.     Brown & Brown made reasonable efforts to keep this information secret, including but not limited to: (a) restricting access to this information from all individuals except those who

worked for Brown & Brown and who had a need to use this information in the course of their authorized duties for Brown & Brown; (b) repeatedly advising its employees with access to this information that they must maintain its confidentiality; (c) requiring employees with access to this information to sign confidentiality agreements and restrictive covenants; and (d) maintaining this information on computer systems which have security features designed to protect this information from unauthorized disclosure and which specifically remind the employees with access to this information that such information is confidential and must be protected.

80.     The aforementioned trade secrets and other confidential and proprietary information were not (and are not) known to the general public, nor did the general public have access to them.

81.     This information is critical to Brown & Brown's economic well-being, and if misappropriated, Brown and Brown's competitors could use this information to gain an economic and competitive advantage over Brown & Brown, thus damaging the Plaintiff.

82.     One of the primary objectives of Swenson's job was to help grow Brown & Brown's business in connection with its acquisition of Hillco, including by increasing and improving Brown & Brown's goodwill with its new clients.

83.     Brown & Brown furthered these objectives by encouraging Swenson to develop unique and personal relationships with its clients so that they would deal directly with Swenson to address their needs associated with Brown & Brown's business and services.

84.     During Swenson's tenure with Brown & Brown and Hillco, Swenson developed significant client relationships with a number of entities on Brown & Brown's behalf.

85.     As a result of these relationships, certain clients identified with Swenson and associated Brown & Brown's business (including through Hillco) with him.

86.     Brown & Brown encouraged continued development of these relationships at its' expense because Swenson had entered into restrictive covenants with Brown & Brown.

***Swenson's Post-Employment Misconduct; Legacy Defendants' Tortious Interference***

87.     On or about June 24, 2024, Swenson resigned from Brown & Brown. In accordance with the Agreement, he continued to provide services to Brown & Brown until approximately June 28, 2024.

88.     On June 25, Swenson was reminded of his restrictive covenant obligations to Brown & Brown, including his non-solicitation obligations.

89.     On June 28, Swenson ceased providing services to Brown & Brown, notwithstanding the fact that he remained employed by Brown & Brown until July 15, 2024.

90.     Upon information and belief, Swenson commenced employment as an insurance agent with the Legacy Defendants during the same June time period in which he remained employed by Brown & Brown, under the guise of the Swenson Defendants.

91.     The Legacy Defendants compete directly with Brown & Brown by, among other things, selling insurance products similar to those offered by Brown & Brown.

92.     Upon information and belief, the Legacy Defendants are actively soliciting insurance clients, including Brown & Brown's clients who were directly serviced and pitched by Swenson, together with Swenson.

93.     Upon information and belief, the Swenson Defendants, at most, serve as a pass-through entity for the Legacy Defendants, and Swenson Insurance Group LLC, in particular, was created to assist the Legacy Defendants and Cooper in circumventing liability for their unlawful conduct.

94.     Upon information and belief, Swenson shared the Agreement, including the details of the restrictive covenants, with the Legacy Defendants at or before the beginning of his employment with them.

95.     Moreover, the Legacy Defendants became aware of the contents of the Agreement no later than when they received a substantially identical copy of the Agreement via the Cease & Desist Letter, attached as Exhibit E.

96.     Upon information and belief, each of the Defendants immediately began conspiring to flout the restrictive covenants contained in Section 6(b) of the Agreement by soliciting work from Restricted Accounts (*e.g.,* Brown & Brown clients for which Swenson provided direct insurance services), accepting work provided by some such Restricted Accounts, and then asking the same Restricted Account clients to execute a form falsely claiming that Swenson had not solicited their business ("Solicitation Disclaimer Form").

97.     Several current and former Brown & Brown clients informed the Plaintiffs about the Defendants' usage of the Solicitation Disclaimer Form.

98.     In addition, insurance companies are required to obtain proof of new coverage in order to process insurance cancellations, such as a Certificate of Liability Insurance.

99.     In at least one case, when Brown & Brown asked a former client for a copy of their new Certificate of Liability Insurance, the client or, upon information and belief, the Defendants, redacted information regarding the insurance salesperson in order to conceal their unlawful solicitation and acceptance of work from Restricted Accounts.

100.    Upon information and belief, Swenson, in his directly competitive role with the Legacy and/or Swenson Defendants, has also misappropriated and disclosed Plaintiff's trade secrets, confidential information, and/or proprietary information to the Legacy Defendants, either

directly or indirectly (including by and through its agents), to secure a competitive advantage over Brown & Brown in violation of his obligations to the Plaintiff.

101.    Upon information and belief, the Defendants have also used Brown & Brown's confidential and proprietary information to solicit the Plaintiff's customers in direct violation of Section 6(a) of the Agreement.

102.    This conduct continued after receipt of the Cease & Desist Letter.

103.    Indeed, when presented with evidence of their misconduct, the Defendants demonstrated an unwillingness to cease their unlawful conduct by continuing to solicit the Plaintiff's clients and causing at least fourteen insurance contracts associated with Swenson to be canceled between July 29, 2024 and the present.

104.    However, as stated above, Defendants also attempted to conceal their unlawful conduct by conspiring for Swenson to create an alter ego entity, Swenson Insurance Group LLC, to hide his relationship with the Legacy Defendants.

105.    Upon information and belief, as of the date of the filing of this Complaint, the Defendants are violating, and continue to violate and/or tortiously interfere with, the restrictive covenants contained in the Agreement and have made no effort to cease their impermissible conduct.

106.    The Defendants' conduct has caused and will continue to cause Brown & Brown significant economic and non-monetary harm unless enjoined.

<u>COUNT I</u>
**BREACH OF CONTRACT (Against Swenson)**

107.    Brown & Brown realleges and incorporates by reference 1-2, 10-28, 45, 51-57, 60-63, 68-75, 79-86, and 90-103 of the foregoing allegations as if fully alleged herein.

108.    Swenson knowingly and voluntarily entered into a lawful and enforceable Agreement with Brown & Brown.

109.    The Agreement contains several restrictive covenants that prohibit Swenson from (a) soliciting work from any of the Restricted Accounts; (b) accepting work from any of the Restricted Accounts or otherwise interfering or reducing in any manner with the business relationship between Brown & Brown and any Restricted Accounts; (c) misappropriating Brown & Brown's trade secrets or confidential information; (d) interfering or otherwise taking any action to cause any referral source, insurance carrier, wholesale broker, independent contract, or other person or entity with a business relationship with Brown & Brown to cease, reduce, or refrain from such business relationship; or (e) directly or indirectly inducing, soliciting, or attempting to influence any Brown & Brown employee to leave Brown & Brown, or otherwise assisting a competitor to hire such an employee.  Exhibit D, § 6 (a-c).

110.    The primary purpose of these restrictive covenants is to reasonably protect Brown & Brown's legitimate business interests, including but not limited to (a) the retention of Brown & Brown's current clients and candidates; (b) the preservation of Brown & Brown's trade secrets, confidential information, and/or proprietary information, including information used to assist in the retention of Brown & Brown's current clients, expand business with Brown & Brown's current clients, and secure prospective clients in the future; (c) the protection of Brown & Brown's investment in training and enhancing Swenson's skill and experience; and (d) the protection of the goodwill Brown & Brown has created with its current clients and prospective future clients.

111.    The scope of the restrictive covenants is reasonable and necessary to protect the Plaintiff's legitimate protectable interests in its confidential, proprietary, and trade secret

information, its current and prospective customer relationships, and the goodwill which is part of the same, and these provisions are valid and enforceable.

112.    Upon information and belief, Swenson breached his Agreement and its attendant restrictive covenants by (a) misappropriating Brown & Brown's trade secrets, confidential information, and/or proprietary information, (b) soliciting Brown & Brown's employees to work for the Legacy Defendants, including Swenson, and (c) directly or indirectly, attempting to divert business opportunities away from Brown & Brown for the benefit of the Legacy Defendants.

113.    Plaintiffs have been damaged and irreparably harmed by Swenson's actions, and will continue to suffer harm if Swenson's contractual violations are allowed to continue, in an amount to be determined at trial.

## COUNT II
## MISAPPROPRIATION (Against All Defendants)

114.    Brown & Brown realleges and incorporates by reference 1-2, 9, 12-14,26-28, 57, 60-70, 73, 75-83, and 94-105 of the foregoing allegations as if fully alleged herein.

115.    Brown & Brown possesses confidential and proprietary information which is protected through policies, trainings, and security measures designed to protect against unauthorized disclosure, as described in greater detail above.

116.    Upon information and belief, Swenson improperly retained Brown & Brown's confidential and proprietary information following the end of his employment with the Plaintiffs.

117.    Upon information and belief, Swenson has, and will continue to, disclose this information to the Legacy (and Swenson) Defendants in order to gain a competitive advantage over Brown & Brown.

118.    In so doing, Swenson has misappropriated Brown & Brown's confidential and/or proprietary information, and Swenson's misappropriation was without justification, excuse, or consent.

119.    Similarly, upon information and belief, the Legacy (and Swenson) Defendants have knowing received and used the Plaintiff's confidential and proprietary information. Their knowing and unlawful use of this information was without justification, excuse, or consent.

120.    Brown & Brown has been damaged and irreparably harmed by the Defendants' actions and will continue to be damaged in an amount to be determined at trial if the Defendants continue to misuse Plaintiff's confidential information, including to solicit Plaintiffs' clients.

## <u>COUNT III</u>
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Legacy Defendants)

121.    Brown & Brown realleges and incorporates by reference 1-2, 3-8, 13-28, 38-51, 56-78, and 84-106  of the foregoing allegations as if fully alleged herein.

122.    Brown & Brown has an enforceable contractual relationship with Swenson, as set forth in the Agreement. *See* <u>Exhibit D</u>.

123.    Prior to entering into the Agreement, Hillco had two enforceable contractual relationships with Swenson, as set forth in the First and Second Hillco Agreements, which were assigned to Brown & Brown as part of the APA. *See* <u>Exhibits A</u> and <u>B</u>.

124.    These contracts required or require Swenson to refrain from soliciting Brown & Brown's clients and competing unfairly with Brown & Brown.

125.    At all times relevant to this Complaint, the Legacy Defendants had actual knowledge of one or more of these contractual relationships.

126.    On July 29, 2024, through the Cease & Desist Letter, the Legacy Defendants were provided with a substantially identical copy of the Agreement, removing all doubt as to their knowledge of the Agreement's existence and contents, and thus, Swenson's obligations to Brown & Brown.

127.    Nonetheless, the Defendants conspired together to created the Solicitation Disclaimer Form, and to continue soliciting and accepting work from Brown & Brown's clients, including the Restricted Accounts.

128.    Upon information and belief, Swenson undertook some of these actions under the guise of the Swenson Defendants.

129.    The Legacy Defendants' interference with Swenson's contractual obligations to Brown & Brown was not privileged or in any way justified, and were conducted with the improper purpose of competing unfairly with Brown & Brown.

130.    Upon information and belief, the Legacy Defendants further exemplified their knowingly unjustified interference by requesting that clients associated with Restricted Accounts (i) execute the fraudulent Solicitation Disclaimer Form, and (ii) otherwise conceal their newfound working relationships from Brown & Brown, such as by redacting Certification of Liability Insurance forms.

131.    Accordingly, the Legacy Defendants intentionally and unjustifiably interfered with, and continue to interfere with, the Agreement by inducing  Swenson to solicit Restricted Accounts and one or more Brown & Brown employees, including but not limited to Swenson.

132.    Brown & Brown has been damaged and irreparably harmed by the Defendants' actions and will continue to be damaged if the Defendants continue to tortiously interfere with Swenson's contract with Brown & Brown, in an amount to be determined at trial.

## <u>COUNT IV</u>
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS
### (Against All Defendants)

133.    Brown & Brown realleges and incorporates by reference 1-2, 3-8, 13-28, 38-51, 56-78, and 84-106 of the foregoing allegations as if fully alleged herein.

134.    Brown & Brown had contractual relationships with the Restricted Accounts, as defined herein.

135.    Swenson knew about Brown & Brown's contractual relationships with the Restricted Accounts because of his direct role in arranging for the contracts between Brown & Brown and the clients constituting the Restricted Accounts and based on the Restricted Accounts' Certificate of Liability Insurance forms.

136.    The Legacy Defendants knew about the contractual relationships between Brown & Brown and the Restricted Accounts because, upon information and belief, Swenson informed them of these relationships and conspired with the Legacy Defendants to interfere with them.

137.    Moreover, the relationships the Restricted Accounts had with both Brown & Brown and with Swenson, in his former roles on behalf of Brown & Brown and Hillco, would also be apparent from the Restricted Accounts' existing Certificate of Liability Insurance forms, which insurance companies generally review in the process of selling customers new insurance products.

138.    With general and specific knowledge of the Restricted Accounts and their contractual relationships with Brown & Brown, the Legacy Defendants intentionally and unjustifiably interfered with these contractual relationships by using Swenson and Brown & Brown's confidential information in order to induce the Restricted Accounts to cease doing business with Brown & Brown and begin doing business with the Legacy Defendants.

139.    Brown & Brown has been damaged and irreparably harmed by the Defendants' actions and will continue to be damaged if the Defendants continue to tortiously interfere with the contracts of their Restricted Accounts, in an amount to be determined at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests the following relief:

A.    Money damages in an amount believed to be in excess of $50,000;

B.    Equitable tolling of the expiration of the temporal restrictions in the Agreement until such time that Swenson begins to comply fully with his obligations under the Agreement;

C.    Injunctive relief in the form of a Court Order requiring Swenson to comply in full with the terms of his Agreement;

D.    The Plaintiff's reasonable attorneys' fees and costs incurred in prosecuting this litigation, to the extent permitted by law;

E.    Pre-judgment and post-judgment interest; and

F.    Such other relief to which the Plaintiff is legally entitled, including all additional relief that the Court deems just and equitable.

***

Date:  November __, 2024                    Respectfully submitted,

HUNTON ANDREWS KURTH LLP


*/s/ Christopher M. Pardo*
Christopher M. Pardo (Fla. Bar No. 41824)
cpardo@HuntonAK.com
60 State Street, Suite 2400
Boston, Massachusetts 02109
Tel:  (617) 648-2759
Fax:  (617) 433-5022

*Attorney for Plaintiff Brown & Brown
Insurance Services, Inc.*

# Exhibit A

## INSURANCE PRODUCT SALES AGREEMENT

This Insurance Product Sales Agreement (this "*Agreement*") is made by and between HILLCO INSURANCE AGENCY, LLC (the "*Company*"), whose address is 17120 Dallas Parkway, Suite 140, Dallas, TX 75248-1140, and Westyn Swenson ("*Agent*"), whose address is 213 Penna Ln, Georgetown, TX 78628 (email: Westynswenson@yahoo.com ; Tel.: 940-733-4598).

### RECITALS:

A.      Company is an independent insurance agency, having its principal place of business in Dallas County, Texas.

B.      Agent is licensed to solicit, sell and service insurance policies and products ("insurance policies") in Texas and wishes to associate with Company to place insurance policies through Company and Company is willing to enter into a business relationship with Agent on the terms and conditions set forth below.

### AGREEMENT:

NOW, THEREFORE, in consideration for the premises recited, the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Company and Agent agree as follows:

1.      **Agent to Sell Insurance**.  Agent shall exercise his best efforts to solicit and sell insurance policies to clients through Company.  Agent shall not place insurance policies through any broker or agent other than Company.

2.      **Agent's Month Reports**.  Agent shall submit to Company on or before the fifth (5th) day of each month a written report of all insurance policies sold by Agent during the immediately preceding month, whether through Company or otherwise, and in such reports shall (a) identify each policy by name of insured, insurance carrier and type of policy sold (e.g. automobile, homeowner's, renter's, life, etc.), (b) state whether the policy is a new or renewal policy, and (c) provide such other information as Company reasonably requests, from time to time.

3.      **Commission Split.**

(a)      Agent shall be entitled to all commissions payable on the first 6 months written premium on policies sold by Agent through Company, without any split to Company. Thereafter, Agent and Company shall share between themselves all commissions payable with respect to insurance policies sold by Agent through Company in the following proportions:

New business: 50% to Agent and 50% to Company.

Renewal business: 50% to Agent and 50% to Company.

Company shall be entitled to receive from the underwriter or broker paying a commission all

commissions payable with respect to insurance policies placed by Agent through Company.

(b)     In addition to the commissions described in subparagraph (a) above, Agent shall be entitled to a portion of all commissions to which Company is entitled with respect to policies sold through Company by an agent/producer hired or engaged by Company on referral by Agent (as evidenced by contemporaneous written notice of referral), such portion being in an amount equal to 25% of the commissions to which Company is entitled after taking into account any commission split between Company and such other agent/producer.

(c)     Company shall pay to Agent the proportion of all commissions to which Agent is entitled under this Agreement on or before the fifteenth (15th) day of the month immediately following the calendar month in which a commission is received by, or credited to, Company, such payment to be accompanied by a payment explanation statement showing how such payment was calculated and identifying the policies with respect to which such payment is made.

(d)     As used herein, commissions payable means and includes commissions debited or credited to Company but does not include any contingency bonus paid or payable to Company.  In the event there is a negative balance at the end of the month for commission payable to Agent, Agent will pay Company the balance within thirty (30) days.  Agent shall not be entitled any part of any contingency bonuses paid to Company.

(e)     Agent shall notify Company within thirty (30) days of his receipt of a commission payment and accompanying payment explanation statement if Agent believes that such payment is deficient or in error in any respect.  Otherwise, such payment and payment explanation statement shall be presumed to be accurate.


4.     **Purchase of Percentage Ownership of Agents Book:**  When Agents book reaches $500,000 in revenue, Agent is entitled to purchase 50% ownership value of book at time of purchase from company.  Agent is also entitled to purchase the remaining 50% from Company , if / When company sells for the same value it would be in the sales price.


5.     **Term**.  This Agreement shall continue until terminated by either party on sixty (60) days' written notice to the other.

7.     **Business on Termination**.  Upon termination of this Agreement, Company shall retain Agent's book of business.

8.     **Agent to Maintain License**.  Agent shall maintain a license to solicit, sell and service insurance policies in the State of Texas for so long as Agent solicits, sells, or services insurance policies through Company.

9.     **No Partnership Formed**.  Company and Agent do not intend by this Agreement to create a partnership between themselves.  Company and Agent acknowledge that they have no agreement to share expenses or profits and that neither has any authority to bind the other to any agreement or liability except as otherwise expressly provided in writing.  Neither shall represent itself/himself as a partner of the other.

10.    **Errors and Omissions Claims**.  Company and Agent shall each maintain liability policies of insurance insuring against liability caused by errors or omissions in the following with minimum coverages as Company shall require, from time to time, with notice to Agent.  If an error or omission claim is asserted against Company with respect to any insurance policy placed by Agent through Company, Company and Agent shall share equally the liability for any deductible and Agent shall pay to Company on demand Agent's share of such deductible.

11.    **Indemnification.**

(a)     Agent shall indemnify, defend and hold harmless Company (as used in this subparagraph, Company includes its directors, officers, shareholders, employees, agents and representatives) from and against any and all claims, demands, causes of action, expenses and other liabilities (including, without limitation, reasonable attorney fees) asserted against or suffered by Agent and arising after the effective date of this Agreement from any act or omission of Agent (such claims, *etc.* being collectively, called "***Agent Liabilities***"); provided, however, Agent's obligations under this sub-paragraph shall not apply with respect to any Agent Liabilities arising, in whole or substantial part, from any act or omission of Company.

(b)     Company shall indemnify, defend and hold harmless Agent (as used in this subparagraph, from and against any and all claims, demands, causes of action, expenses and other liabilities (including, without limitation, reasonable attorney fees) asserted against or suffered by Company and arising after the effective date of this Agreement from any act or omission of Company (such claims, *etc.* being collectively, called "***Company Liabilities***"); provided, however, Company's obligations under this sub-paragraph shall not apply with respect to any Company Liabilities arising, in whole or substantial part, from any act or omission of Agent.

12.    **Non-Solicitation**.  Agent acknowledges that he will acquire information concerning existing and future clients of Company such as the identities of such clients and their insurance needs.  Agent shall not, directly or indirectly, for a period of three (3) years following the termination of this Agreement intentionally, knowingly or recklessly solicit or attempt to solicit, for himself or for another, any Company client for the sale of any insurance policy, product or other like business.  This paragraph shall survive any termination of this Agreement.

13.    **Notices.**  All notices, demands, requests, approvals and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given when presented personally or deposited in a regularly maintained mail receptacle of the United States

Postal Service, postage prepaid, registered or certified, return receipt requested, addressed to Company or Agent, as the case may be, at the respective addresses set forth on the first page of this Agreement, or such other address as Company or Agent may from time to time designate by written notice to the other.

14.    **Dispute Resolution**.

(a)    *Mediation*. If a dispute arises from or relates to this Agreement or the breach thereof, and if the dispute cannot be settled through direct discussions, Company and Agent (or Company, as the case may be) shall endeavor first to settle the dispute by mediation administered by the American Arbitration Association in Dallas, Texas before resorting to arbitration. Company and Agent shall bear the cost of mediation equally.

(b)    *Arbitration*.

(i)    Any unresolved controversy or claim arising out of or relating to this Agreement, or breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(ii)    Claims shall be heard by a single arbitrator, unless the claim amount exceeds $250,000, in which case the dispute shall be heard by a panel of three arbitrators.

(iii)    Within fifteen (15) days after the commencement of arbitration, each party shall select one person to act as arbitrator and the two selected shall select a third arbitrator within ten (10) days of their appointment. If the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator, the third arbitrator shall be selected by the American Arbitration Association. The arbitrator(s) shall be experienced in insurance brokerage and agency matters.

(iv)    The place of arbitration shall be Dallas, Texas.

(v)    The arbitration shall be governed by the laws of the State of Texas.

(vi)    Hearings will take place pursuant to the standard procedures of the Commercial Arbitration Rules that contemplate in person hearings. Time is of the essence for any arbitration under this Agreement and arbitration hearings shall take place within ninety (90) days of filing and awards rendered within one hundred twenty (120) days. Arbitrator(s) shall agree to these limits prior to accepting appointment. The standard provisions of the Commercial Rules shall apply.

(vii)    Arbitrators will have the authority to allocate the costs of the arbitration process among the parties, but will only have the authority to allocate attorneys' fees if a particular law permits them to do so. The award of the arbitrators shall be accompanied by a reasoned opinion.

(viii)    Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

(ix)    Failure or refusal of a party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that party to present evidence or cross-examine witness. In such event, the other party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award. Such waiver shall not allow for a default judgment against the non-paying party in the absence of evidence presented as provided for above.

(c)    *Injunctive and Other Relief*. Nothing herein shall preclude Company or Agent from seeking, from a court of competent jurisdiction, injunctive relief to enjoin a threatened or continuing breach of this Agreement or an order compelling compliance with the mediation and arbitration requirements of this Agreement.

(d)    This Section 12 shall survive any termination of this Agreement.

15.    **Assignment**. Neither this Agreement nor any duties or obligations may be assigned by Agent without the prior written consent of Company, which may be withheld or conditioned as determined by Company in its sole discretion. In the event of an assignment by the Agent to which Company has consented, the assignee or the assignee's legal representative must agree in writing with Company to personally assume, perform, and be bound by all the provisions of this agreement.

16.    **Successors and Assigns**. Subject to the provisions regarding assignment, this Agreement is binding on and inures to the benefit of Agent and Company and their respective heirs, executors, administrators, legal representatives, successors, and assigns.

17.    **Attorney's Fees**. If any action at law or in equity is brought to enforce or interpret the provisions of this Agreement, the prevailing party is entitled to reasonable attorney's fees in addition to any other relief to which he or it may be entitled.

18.    **Entire Agreement and Modifications.** This Agreement constitutes the entire understanding and agreement between Company and Agent with respect to the specific matters addressed herein and supersedes all prior written or oral understandings and agreements between Company and Agent in connection therewith. No provision of this Agreement may be modified, waived, or terminated except by instrument in writing executed by the party against whom a modification, waiver, or termination is sought to be enforced.

19.    **Severability.** In case any of the provisions of this Agreement shall for any reason be held to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

20.    **Number and Gender.** Whenever used herein, the singular number shall include the plural and the plural the singular, and the use of any gender shall be applicable to all genders.

21.    **Captions.** The captions, headings, and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

22.    **Applicable Law; Venue.**  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. VENUE FOR ANY DISPUTES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL LIE EXCLUSIVELY IN DALLAS COUNTY, TEXAS.

Executed on the dates set forth in the acknowledgments below, to be effective as of the last such date.

HILLCO INSURANCE AGENCY, LLC,
a Texas limited liability company

By: _____
James Hunter Hill, its President

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

The foregoing document was acknowledged before me on February 26th, 2021, by JAMES HUNTER HILL, President of HILLCO INSURANCE AGENCY, LLC, a Texas limited liability company, on behalf of such limited liability company.

_____
Notary Public, State of Texas
My Commission Expires: _____
Notary ID #: _____

Westyn Swenson

STATE OF TEXAS                    §
                                 §
                                        COUNTY OF DALLAS                    §

    The foregoing document was acknowledged before me on ~February 24eth~ , 2021, by Westyn Swenson.


Notary Public, State of Texas
My Commission Expires: _____
Notary ID #: _____

Exhibit B

DocuSign Envelope ID: ███████-4F45-87DB-4FC26A6A9C66

## INSURANCE PRODUCT SALES AGREEMENT

This Insurance Product Sales Agreement (this "**Agreement**") is made by and between HILLCO WEST TEXAS LLC (the "**Company**"), whose address is 17120 Dallas Parkway, Suite 140, Dallas, TX 75248-1140, and WESTYN SWENSON ("**Agent**"), whose address is 704 W. Highway Street, Iowa Park, TX 76367 (email: wswenson@hillcoinsurance.com; Tel.: 940-733-4598).

### RECITALS:

A. Company is an independent insurance agency, having its principal place of business in Dallas County, Texas.

B. Agent is licensed to solicit, sell and service insurance policies and products ("**Insurance Policies**") in Texas and wishes to associate with Company to place insurance policies through Company and Company is willing to enter into a business relationship with Agent on the terms and conditions set forth below.

### AGREEMENT:

NOW, THEREFORE, in consideration for the premises recited, the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Company and Agent agree as follows:

1. **Agent to Sell Insurance**. Agent shall exercise his best efforts to solicit and sell Insurance Policies to clients through Company. Agent shall not place Insurance Policies through any broker or agent other than Company.

2. **Agent's Month Reports**. Agent shall submit to Company on or before the fifth (5th) day of each month a written report of all Insurance Policies sold by Agent during the immediately preceding month, whether through Company or otherwise, and in such reports shall (a) identify each policy by name of insured, insurance carrier and type of policy sold (e.g. automobile, homeowner's, renter's, life, etc.), (b) state whether the policy is a new or renewal policy, and (c) provide such other information as Company reasonably requests, from time to time.

3. **Commission Split.**

   (a) Agent and Company shall share between themselves all commissions payable with respect to Insurance Policies sold by Agent through Company in the following proportions:

      i. <u>New & Renewal Business</u>: Eighty percent (80%) to Agent and twenty percent (20%) to Company. The Company shall be entitled to receive from the underwriter or broker paying a commission all commissions payable with respect to Insurance Policies placed by Agent through Company.

   (b) Company shall pay to Agent the proportion of all commissions to which Agent is entitled under this Agreement on or before the fifteenth (15th) day of the month immediately following the calendar month in which a commission is received by, or credited to,

DocuSign Envelope ID: ████████9-4F45-87DB-4FC26A6A9C66

Company, such payment to be accompanied by a payment explanation statement showing how such payment was calculated and identifying the policies with respect to which such payment is made.

(c)  As used herein, commissions payable means and includes commissions debited or credited to Company but does not include any contingency bonus paid or payable to Company. In the event there is a negative balance at the end of the month for commission payable to Agent, Agent will pay Company the balance within thirty (30) days. Agent shall not be entitled to any part of any contingency bonuses paid to Company.

(d)  Agent shall notify Company within thirty (30) days of his receipt of a commission payment and accompanying payment explanation statement if Agent believes that such payment is deficient or in error in any respect. Otherwise, such payment and payment explanation statement shall be presumed to be accurate.

(e)  Agent shall have the option to purchase fifty percent (50%) of his book of business once his total annual revenue equals or exceeds Five Hundred Thousand and NO/100 Dollars ($500,000.00). Agent will also have the option to buy out his book of business from any sale of the Company for the same multiple the Company is selling for.

4.  **Term**. This Agreement shall continue until terminated by either party on sixty (60) days' written notice to the other.

5.  **Business on Termination**. Upon termination of this Agreement, Company shall retain Agent's book of business.

6.  **Agent to Maintain License**. Agent shall maintain a license to solicit, sell and service Insurance Policies in the State of Texas (and any other state necessary) for so long as Agent solicits, sells, or services Insurance Policies through Company. Agent shall reimburse Company for any Non Resident Company licenses required to place business.

7.  **No Partnership Formed**. Company and Agent do not intend by this Agreement to create a partnership between themselves. Company and Agent acknowledge that they have no agreement to share expenses or profits and that neither has any authority to bind the other to any agreement or liability except as otherwise expressly provided in writing. Neither shall represent itself/himself as a partner of the other.

8.  **Errors and Omissions Claims**. Company and Agent shall each maintain liability policies of insurance insuring against liability caused by errors or omissions in the following with minimum coverages as Company shall require, from time to time, with notice to Agent. If an error or omission claim is asserted against Company with respect to any insurance policy placed by Agent through Company, Agent shall be responsible for the liability for any deductible and Agent shall pay to Company on demand Agent's share of such deductible.

9.  **Indemnification**.

(a)  Agent shall indemnify, defend and hold harmless Company (as used in this subparagraph, Company includes its directors, officers, shareholders, employees, agents and representatives) from and against any and all claims, demands, causes of action, expenses

DocuSign Envelope ID: ██████████-4F45-87DB-4FC26A6A9C66

and other liabilities (including, without limitation, reasonable attorney fees) asserted against or suffered by Agent and arising after the effective date of this Agreement from any act or omission of Agent (such claims, *etc.* being collectively, called "***Agent Liabilities***"); provided, however, Agent's obligations under this sub-paragraph shall not apply with respect to any Agent Liabilities arising, in whole or substantial part, from any act or omission of Company.

(b) Company shall indemnify, defend and hold harmless Agent (as used in this subparagraph, from and against any and all claims, demands, causes of action, expenses and other liabilities (including, without limitation, reasonable attorney fees) asserted against or suffered by Company and arising after the effective date of this Agreement from any act or omission of Company (such claims, *etc.* being collectively, called "***Company Liabilities***"); provided, however, Company's obligations under this sub-paragraph shall not apply with respect to any Company Liabilities arising, in whole or substantial part, from any act or omission of Agent.

10. **Non-Solicitation**. Agent acknowledges that he will acquire information concerning existing and future clients of Company such as the identities of such clients and their insurance needs. Agent shall not, directly or indirectly, for a period of two (2) years following the termination of this Agreement intentionally, knowingly or recklessly solicit or attempt to solicit, for himself or for another, any Company client for the sale of any insurance policy, product or other like business. This paragraph shall survive any termination of this Agreement.

11. **Non-Competition**. Agent agrees that, in the event of termination of this Agreement, for a period of two (2) years following the termination of this Agreement, the Agent will not, without the Company's consent, directly or alone or as a partner, joint venturer, officer, director employee, consultant, agent, independent contractor or stockholder or other owner of any entity or business, engage in any business which is directly competitive with the business of the Company in any territory in which the Company is engaged in business at the date of termination, including (i) any line of business that is engaged in by the Company and its subsidiaries as of the date of this Agreement; or (ii) any other line of business that is engaged in by the Company (or with respect to which the Company has made preparations to engage) as of the date of such termination of this Agreement.

12. **Notices.** All notices, demands, requests, approvals and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given when presented personally or deposited in a regularly maintained mail receptacle of the United States Postal Service, postage prepaid, registered or certified, return receipt requested, addressed to Company or Agent, as the case may be, at the respective addresses set forth on the first page of this Agreement, or such other address as Company or Agent may from time to time designate by written notice to the other.

13. **Dispute Resolution**.

(a) *Mediation.* If a dispute arises from or relates to this Agreement or the breach thereof, and if the dispute cannot be settled through direct discussions, Company and Agent (or Company, as the case may be) shall endeavor first to settle the dispute by mediation

DocuSign Envelope ID: ███████████9-4F45-87DB-4FC26A6A9C66

administered by the American Arbitration Association in Dallas, Texas before resorting to arbitration. Company and Agent shall bear the cost of mediation equally.

(b) *Arbitration.*

    i. Any unresolved controversy or claim arising out of or relating to this Agreement, or breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

    ii. Claims shall be heard by a single arbitrator, unless the claim amount exceeds Two Hundred and Fifty Thousand and NO/100 Dollars ($250,000.00), in which case the dispute shall be heard by a panel of three arbitrators.

    iii. Within fifteen (15) days after the commencement of arbitration, each party shall select one person to act as arbitrator and the two selected shall select a third arbitrator within ten (10) days of their appointment. If the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator, the third arbitrator shall be selected by the American Arbitration Association. The arbitrator(s) shall be experienced in insurance brokerage and agency matters.

    iv. The place of arbitration shall be Dallas, Texas.

    v. The arbitration shall be governed by the laws of the State of Texas.

    vi. Hearings will take place pursuant to the standard procedures of the Commercial Arbitration Rules that contemplate in-person hearings. Time is of the essence for any arbitration under this Agreement and arbitration hearings shall take place within ninety (90) days of filing and awards rendered within one hundred twenty (120) days. Arbitrator(s) shall agree to these limits prior to accepting appointment. The standard provisions of the Commercial Rules shall apply.

    vii. Arbitrators will have the authority to allocate the costs of the arbitration process among the parties, but will only have the authority to allocate attorneys' fees if a particular law permits them to do so. The award of the arbitrators shall be accompanied by a reasoned opinion.

    viii. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

    ix. Failure or refusal of a party to pay its required share of the deposits for arbitrator compensation or administrative charges shall constitute a waiver by that party to present evidence or cross-examine witness. In such event, the other party shall be required to present evidence and legal argument as the arbitrator(s) may require for the making of an award. Such waiver shall not allow for a default judgment against the non-paying party in the absence of evidence presented as provided for above.

(c) *Injunctive and Other Relief.* Nothing herein shall preclude Company or Agent from seeking, from a court of competent jurisdiction, injunctive relief to enjoin a threatened or continuing breach of this Agreement or an order compelling compliance with the mediation and arbitration requirements of this Agreement.

(d) This Section 14 shall survive any termination of this Agreement.

DocuSign Envelope ID: ████████9-4F45-87DB-4FC26A6A9C66

14. **Assignment**. Neither this Agreement nor any duties or obligations may be assigned by Agent without the prior written consent of Company, which may be withheld or conditioned as determined by Company in its sole discretion. In the event of an assignment by the Agent to which Company has consented, the assignee or the assignee's legal representative must agree in writing with Company to personally assume, perform, and be bound by all the provisions of this agreement.

15. **Successors and Assigns**. Subject to the provisions regarding assignment, this Agreement is binding on and inures to the benefit of Agent and Company and their respective heirs, executors, administrators, legal representatives, successors, and assigns.

16. **Attorney's Fees**. If any action at law or in equity is brought to enforce or interpret the provisions of this Agreement, the prevailing party is entitled to reasonable attorney's fees in addition to any other relief to which he or it may be entitled.

17. **Entire Agreement and Modifications.** This Agreement constitutes the entire understanding and agreement between Company and Agent with respect to the specific matters addressed herein and supersedes all prior written or oral understandings and agreements between Company and Agent in connection therewith. No provision of this Agreement may be modified, waived, or terminated except by instrument in writing executed by the party against whom a modification, waiver, or termination is sought to be enforced.

18. **Severability.** In case any of the provisions of this Agreement shall for any reason be held to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

19. **Number and Gender.** Whenever used herein, the singular number shall include the plural and the plural the singular, and the use of any gender shall be applicable to all genders.

20. **Captions.** The captions, headings, and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

21. **Applicable Law; Venue.** THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. VENUE FOR ANY DISPUTES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL LIE EXCLUSIVELY IN DALLAS COUNTY, TEXAS.

IN WITNESS WHEREOF, this Agreement is executed to be effective as of the _16_ day of _November_ 2023.

**COMPANY:**

HILLCO WEST TEXAS LLC,
a Texas limited liability company

By: _____
James Hunter Hill, its Manager

**AGENT:**

Westyn Swenson
Westyn Swenson, an individual

# Exhibit C



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas**
**Filing #:** ▮▮▮▮▮  **05/31/2022**
**Document #:** ▮▮▮▮
**Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Swenson Capital LLC

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

## United States Corporation Agents, Inc.

**OR**

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**9900 Spectrum Drive    Austin  TX  78717**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

**OR**

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐A. The limited liability company is to be managed by managers.

**OR**

☑B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Managing Member 1: **Westyn    Swenson**              Title: **Managing Member**

Address: **10 Brady Crt.    Iowa Park  TX, USA  76367**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

### Initial Mailing Address

Address to be used by the Comptroller of Public Accounts for purposes of sending tax information.

The initial mailing address of the filing entity is:
**10 Brady Crt.**
**Iowa Park, TX 76367**
**USA**

### Organizer

The name and address of the organizer are set forth below.
**LegalZoom.com, Inc.**      **101 N. Brand Blvd., 11th Floor, Glendale, CA 91203**

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Cheyenne Moseley, Asst. Secretary, LegalZoom.com, Inc.**

Signature of Organizer

**FILING OFFICE COPY**

# Exhibit D

<u>**FINAL EXECUTION VERSION**</u>

<u>**EMPLOYMENT AGREEMENT**</u>

THIS **EMPLOYMENT AGREEMENT** ("<u>Agreement</u>"), effective as of March 1, 2024 (the "<u>Effective Date</u>"), is entered into by and between **BROWN & BROWN INSURANCE SERVICES, INC.**, a Florida corporation (the "<u>Company</u>"), and **WESTYN SWENSON**, a resident of the State of Texas ("<u>Employee</u>"). The Company and Employee are sometimes referred to herein individually as a "<u>Party</u>" and collectively as "<u>Parties</u>".

**BACKGROUND**

A.      Employee is an employee of Hillco Insurance Agency, LLC, a Texas limited liability company ("<u>Hillco Agency</u>"); Hillco Insurance Agency Services LLC, a Texas limited liability company ("<u>Hillco Services</u>"); and/or Hillco West Texas LLC, a Texas limited liability company ("<u>Hillco West</u>") and together with Hillco Agency and Hillco Services, each a "<u>Seller</u>" and collectively, the "<u>Sellers</u>"). The Company, the Sellers and Sellers' member are parties to that certain Asset Purchase Agreement, effective as of the Effective Date (the "<u>Purchase Agreement</u>"), pursuant to which the Company has agreed to acquire substantially all of the Insurance Business (as defined below)-related assets of Sellers (the "<u>Acquisition</u>").

B.      In connection with and conditioned upon the completion of the Acquisition, the Company has made an offer of employment to Employee and Employee is willing to accept such offer on the terms and conditions set forth in this Agreement. Because of Employee's employment with Sellers prior to the Acquisition, Employee has access to Confidential Information, as defined in this Agreement, of such Sellers and participated in the development of Sellers' customer relationships and business goodwill. Because of Employee's employment with the Company after the Acquisition, Employee shall have access to Confidential Information, as defined in this Agreement, of the Company. Such Confidential Information, as well as the Company's customer relationships and business goodwill, constitute valuable assets of the Company.

C.      The Company has a compelling interest in maintaining the confidentiality of Confidential Information, retaining its employees, and maintaining the customer and referral source relationships and business goodwill Company acquires. The provisions of the Background paragraphs set forth above are hereby incorporated into this Agreement as if set forth herein at length.

**NOW, THEREFORE**, the Parties, intending to be legally bound, hereby agree as follows:

1.      **Certain Defined Terms.** For the purposes of this Agreement, the term:

(a)      "<u>Insurance Business</u>" means the business of quoting, placing, providing, servicing and/or renewing Insurance Products or Services as defined below.

(b)      "<u>Insurance Products or Services</u>" means (1) Employee Benefits Products or Services, (2) Insurance-Related Services, and/or (3) P&C Products or Services, as such terms are defined below:

(i)      "<u>Employee Benefits Products or Services</u>" means (i) employer-sponsored benefits accounts with programs, whether self-insured or fully insured, such as group life, group health, group dental, group disability, group long-term care, ancillary benefits sold to groups and similar or related products and services, and (ii) insurance procured for individual, natural persons (e.g., life, health, annuities, long-term care and similar or related products and services.)

(ii)      "<u>Insurance-Related Services</u>" means any services provided to a Client Account, either directly or by a third-party service provider, whether or not for a fee and whether or not pursuant to a written contract, including but not limited to; risk management; loss control; compliance or other consulting services; claims analysis; insurance program administration; enrollment services; COBRA,

Section 125 Cafeteria Plan, Health Savings Account (HSA) Plan, Health Reimbursement Arrangement (HRA) Plan, Health Flexible Spending Account (FSA) Plan, and/or Premium Reimbursement Arrangement (PRA) Plan administration; preparation, review and/or filing of IRS Form 5500s; referrals to on-site medical clinics, attorneys, or other third-party service providers (whether or not a referral fee or other remuneration is paid by such providers for such referrals); or other services.

(iii)     "P&C Products or Services" means (i) commercial lines or personal lines property and casualty insurance products, and/or (ii) commercial or individual bond or suretyship products.

(c)     "Client Account" means any Person (as defined below) to whom Insurance Products or Services (or any other products or services sold for fee(s) or commission(s) at the time Employee's employment with the Company ends) have been provided by the Company.

(d)     "Prospective Client Account" means any Person as to whom the Company has directly quoted, proposed, or solicited any insurance or services within the preceding twenty-four (24) months of Employee's employment with the Company.

(e)     "Person" means an individual, partnership, corporation, business trust, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture or other entity or a governmental body.

2.     **Employment and Job Duties**. During Employee's employment with the Company, Employee shall not, directly or indirectly, engage in the Insurance Business in any of its phases, in any capacity, in any manner or in any firm or corporation engaged in the Insurance Business, except on behalf of the Company or as directed by the Company. Employee agrees that so long as Employee is working for the Company, Employee shall not undertake the planning or organizing of any business activity that is competitive with or that creates a conflict of interest with the work Employee performs for the Company. Unless otherwise agreed, Employee shall devote all of Employee's productive business time to duties set forth by the Company; provided, however, that nothing in this **Section 2** shall prevent or be deemed to prohibit Employee from spending time on Employee's passive investments, non-competitive businesses, the wind up of affairs of Sellers, including collection of Sellers' Accounts Receivable, provided further, however, that the activities described above do not materially interfere with the satisfactory performance of Employee's duties to the Company or require that any Company business time be expended by any other employee of the Company.

3.     **Compensation and Benefits**.

(a)     The Company shall compensate Employee as agreed between the Company and Employee from time to time.

(b)     All compensation arrangements, including fringe benefits or group benefits, are generally subject to increase or decrease, change, withdrawal or modification at any time, and from time to time, at the sole discretion of the Company and Parent, subject to applicable wage and hour laws. The Company is not bound to continue any level, or kind, of compensation or benefit. Where the benefits are governed by formal plan documents and summary plan descriptions, the terms of those documents govern. The Company, or Parent, has the right to modify, amend or terminate any benefit plan or its contributions to any benefit plan at any time.

4.     **Term, Termination and Notice Period**.

(a)     Employee shall serve as an at-will employee of the Company, meaning that the employment relationship memorialized by this Agreement may be terminated by Company or Employee at any time, with or without cause or advance notice and without the requirement of any procedural steps such

as warnings or progressive discipline. As an at-will employee, the Company does not guarantee any employment for any length of time or duration.

(b)     Employee may terminate Employee's employment without cause on no less than thirty (30) days' advance notice (the "Notice Period"). During the Notice Period, Employee shall continue to perform Employee's responsibilities; provided, however, that the Company may, in its sole discretion, waive the Notice Period and consider Employee's termination effective immediately or continue Employee's employment during the Notice Period but cease Employee's active work for the Company. The Company may require Employee to immediately leave the Company premises and/or return Company property upon providing notice of termination of your employment.

(c)     Termination of Employee's employment under this Agreement, whether with or without cause, shall not release either Employee or the Company from obligations hereunder through the date of such termination date ("Termination Date") nor from the applicable provisions of this Agreement, including, without limitation, **Sections 4** through **19**, which shall survive the termination of Employee's employment and shall, likewise, continue to apply and be valid notwithstanding any change in Employee's duties, responsibilities, compensation, position, or title. Upon notice of termination of or by Employee, the Company has the power to suspend Employee from all duties on the date notice is given, and to immediately require the return of all professional documentation as described in the Agreement. The Company has the further right to impound all property on Company premises, including such property owned by Employee, for a reasonable time following termination, to permit the Company to inventory the property and ensure that its property and trade secrets are not removed from the premises. Employee acknowledges that Employee has no right or expectation of privacy with respect to property kept on Company premises, or equipment provided by the Company, including any such information maintained on computer systems or electronic communications devices utilized by Employee during employment by the Company. On or after the Termination Date, or at any time upon demand, Employee shall immediately return to the Company, all: (i) tangible Confidential Information in Employee's possession or control including, but not limited to, copies, notes, abstracts, summaries, tapes or other record of any type of Confidential Information; and (ii) other property in Employee's possession or control including, without limitation, any and all keys, security cards, passes, credit cards, and marketing literature, any electronic data stored on a computer, and Employee shall not destroy, delete or otherwise damage any such Confidential Information or property.

5.     **Company Property.**  Employee acknowledges and agrees that the following, without limitation, are the sole and exclusive property of the Company, and that the Employee has no right, title  or interest in or to: (i) any and all Client Accounts; Prospective Client Accounts; and personal relationships and goodwill associated with Client Accounts, Prospective Client Accounts, brokers, insurance carriers, third-party administrators and other insurance markets, vendors, and referral sources of Insurance Business that have been cultivated by Employee before and/or during Employee's employment with the Company; and (ii) any related documents, lists, account information and other Confidential Information (as defined below) in Employee's possession or control before or during Employee's employment with the Company. Employee further acknowledges and agrees that the foregoing pertains to all types of Client Accounts and Prospective Client Accounts, including, without limitation, any individual or group life, health, or other employee benefits insurance Client Accounts whose or which business, whether obtained before or during Employee's employment with the Company, and whether or not they reflect Employee individually, rather than the Company, as the agent-of-record with an insurance carrier or the primary contracting party with a Client Account or other Person.

6.     **Confidential Information; Covenant Not to Solicit or Service Client Accounts or Prospective Client Accounts; Covenant Not to Solicit Employees; Non-Interference; Related Matters.**

(a)     *Confidential Information.*

(i)     "Confidential Information" includes all information and data (and compilations of information and data), whether or not reduced to written or recorded form, that is related to

the business of Company or an Affiliate (as defined below) and that is not generally known or accessible to members of the public and/or competitors of the Company or an Affiliate through proper means, nor intended for general dissemination, and as to which the Company and its Affiliate take reasonable steps to remain confidential, whether furnished by the Company or an Affiliate or compiled by Employee. By way of example and not limitation, Confidential Information includes: the financial condition, results of operations, compensation or fees paid to the Company, pricing structures for certain business relationships and other non-public information regarding the Company or its Affiliates; management evaluations of the Company's or an Affiliate's resources/assets (such as technology, real estate, and employee job performance); information regarding the potential or completed merger, acquisition or sale of business assets; trade secrets; the identity of decision-makers at Client Accounts or Prospective Client Accounts and their unpublished contact information; private contract terms with preferred pricing vendors; the lists of Client Accounts, Prospective Client Accounts, insurance carriers, policy forms, and/or rating information, expiration dates, information on risk characteristics; information concerning insurance markets for large or unusual risks; and records pertaining thereto. However, Confidential Information shall not include information that (A) is or becomes publicly available other than as a result of disclosure by Employee, or (B) is now or hereafter becomes available to Employee on a non-confidential basis from a source (other than the Company) that is not prohibited from disclosing such information to Employee. "<u>Affiliate</u>" means: (1) Parent; (2) any subsidiary of the Company or Parent; or (3) any entity directly, or indirectly, under common control with the Company.

(ii)     Employee acknowledges and agrees that the Company and its Affiliates are engaged in the highly competitive Insurance Business, have expended, or will expend, significant sums of money, and have invested, or will invest, a substantial amount of time to develop and use, and maintain the secrecy of, the Confidential Information of the Company and its Affiliates. The Company has thus obtained, or will obtain, a valuable economic asset which has enabled, or will enable, it to develop an extensive reputation and to establish long-term business relationships with its Client Accounts, Prospective Client Accounts, insurance carriers, brokers, managing general agents and/or vendors. If such Confidential Information were disclosed to another person or entity or used for the benefit of anyone other than the Company or its Affiliates, the Company and/or its Affiliates with suffer irreparable harm, loss and damage. Accordingly, Employee acknowledges and agrees that the Confidential Information of the Company and its Affiliates are, and at all times hereafter shall remain, the sole and exclusive property of the Company and its Affiliates. Employee further acknowledges that the Company and its Affiliates have invested, and will invest, valuable resources to create compilations of Confidential Information and that such compilations would provide an unfair advantage to a competitor if shared with or used for the benefit of the competitor; therefore, compilations of Confidential Information do not lose their economic value or protection as Confidential Information because a subset of information in the compilation becomes public. To protect the Confidential Information of the Company and its Affiliates, and other employees who depend on the Company for regular employment, Employee shall use Employee's best efforts and the utmost diligence to guard and protect the Confidential Information from any unauthorized disclosure to any competitor, Client Account, insurance carrier, broker, managing general agent, and/or vendor of the Company or its Affiliates or any other person or entity.

(iii)     Unless the Company gives Employee prior express permission, during Employee's employment and thereafter, Employee shall not use, transmit, copy or download for Employee's own benefit, or use, transmit, copy or download for or disclose to any competitor, Client Account, Prospective Client Account, insurance carrier, broker, managing general agent, and/or vendor of the Company or any other Person, the Confidential Information as set forth herein including, without limitation, using, copying or downloading or disclosing any Confidential Information to solicit or divert any Insurance Business on behalf of any person or entity other than the Company; and Employee shall use Employee's best efforts and the utmost diligence to guard and protect the Confidential Information from any such unauthorized disclosure or use by Employee or any other person.

(iv)　　Employee understands that it is the Company's intention to maintain the confidentiality of its Confidential Information notwithstanding that employees of the Company may have access to the information for the purpose of performing their duties with the Company. Employee acknowledges that it is not practical, and shall not be necessary, to mark such information as "confidential," nor to transfer it within the Company by confidential envelope or communication, in order to preserve the confidential nature of the information. To the contrary, Employee understands and agrees that all such information shall be deemed Confidential Information and Employee shall treat all such information as such. Employee agrees not to destroy or delete any Confidential Information, including but not limited to any electronic data stored on a computer, before returning such Confidential Information to the Company.

(v)　　Employee will not use in Employee's employment or disclose to the Company any confidential information of a third party (including any former employer of Employee) ("Third Party Information") unless the Company first receives written authorization from the third party allowing the use or disclosure of such information and unless the Company agrees in writing to receive such information on terms acceptable to the Company. Employee will abide by restrictions imposed on the disclosure and use of such third party information. Employee warrants that no nondisclosure, assignment of inventions, non- solicitation, or other agreement exists with any prior employer or other party which could affect Employee's employment by or ability to work for the Company, except as Employee has already disclosed to the Company in writing.

(vi)　　The restrictions provided for in this **Section 6(a)** is not a covenant not to compete, and at all times after Employee's employment with the Company ends, Employee is free to use information which is generally known in the trade or industry through no breach of this Agreement or other act or omission by Employee and that is not specific to the Company's business (such as its business transactions, clients, employees, or products). If required by applicable law, the confidentiality restrictions in **Section 6(a)(iii)** will only apply for three (3) years after the end of Employee's employment with the Company, where Confidential Information that does not qualify as a trade secret or Third Party Information is concerned; however, the restrictions will continue to apply to trade secret information for as long as the information at issue remains qualified as a trade secret, and will continue to apply to Third Party Information for as long as allowed under the laws and/or separate agreements that make them confidential.

(b)　　*Non-Solicitation Covenants.*　　For a period of two (2) years following the Termination Date (the "Restricted Period"):

(i)　　Employee shall not, directly or by assisting or directing others, in any capacity whatsoever other than on behalf of the Company: (x), solicit, or attempt to solicit, any Restricted Client Account, or, where allowed by law, any Restricted Prospective Client Account, for the purpose of doing any business that would compete with the Company's or Affiliates' business; or (y) accept, take away, propose, quote, sell, place, provide, service, renew or divert any business from a Restricted Client Account, or where allowed by law, Restricted Prospective Client Account.

For purposes of this Agreement, "Restricted Client Account" means any Client Account that Employee either had some involvement in proposing, quoting, selling, placing, providing, servicing or renewing any Insurance Products or Services or about whom Employee received any Confidential Information during the last two years of their employment with the Company (or such shorter time as they were employed)(the "Look Back Period"); and "Restricted Prospective Client Account" means any Prospective Client Account that Employee either had some involvement in proposing or quoting any Insurance Products or Services or about whom Employee received any Confidential Information during the Look Back Period.

Employee acknowledges that informing Client Accounts or Prospective Client Accounts that Employee is or may be leaving Company prior to Employee leaving employment of Company shall be deemed to constitute prohibited solicitation under this Agreement absent the Company's prior written consent.

(ii)    In addition, Employee shall not interfere or take any action intended to, or which reasonably may be expected to, cause any Restricted Client Account or, where allowed by law, Restricted Prospective Client Account, to cease, reduce or refrain from transacting business with the Company or its Affiliates (**Sections 6(b)(i) and (ii)** shall be collectively known as the "Client Non-Solicit Obligations").

(iii)    Further, Employee shall not interfere or take any action intended to, or which reasonably may be expected to, cause any Restricted Key Relationship to cease, reduce or refrain from transacting business with the Company or its Affiliates (the "Key Relationship Non-Interference Obligations").

For purposes of this Agreement, "Restricted Key Relationship" means any insurance carrier, wholesale broker, independent contractor (other than independent contractor producers) or other person or entity with a material business relationship with the Company with whom/which Employee had dealings or contact on behalf of the Company or about whom/which Employee received any Confidential Information during the Look Back Period.

(iv)    Employee shall not, directly or by assisting or directing others: (x) solicit, or attempt to solicit, any Restricted Person to terminate such employee's employment with the Company or an Affiliate for any reason, including, without limitation, to work for Employee or any competitor of the Company; or (y) on behalf of any competitor of the Company, facilitate the hiring or engagement of a Restricted Person, or seek to induce or encourage a Restricted Person to terminate such person's employment or engagement with the Company (**Section 6(b)(iv)** shall be collectively known as the "Restricted Person Non-Solicit Obligations"). Nothing herein is intended or to be construed as a prohibition against general advertising such as "help wanted" ads that are not targeted at the Company's or its Affiliates' employees.

For purposes of this Agreement, "Restricted Person" shall mean: (i) any employee of the Company or its Affiliates with whom Employee worked, whom Employee supervised or about whom Employee acquired Confidential Information; and (ii) any independent contractor producer of the Company or its Affiliates with whom Employee worked, whom Employee supervised or about whom Employee acquired Confidential Information.

(v)    Further, Employee shall not: (x) solicit any Restricted Referral Source for the purpose of doing any business that would compete with the Company's or Affiliates' business; or (y) on behalf of any competitor of the Company, interfere or take any other action intended to, or which reasonably may be expected to, cause any Restricted Referral Source to cease, reduce or refrain from transacting business with the Company or its Affiliates (the "Referral Source Non-Interference Obligations").

For purposes of this Agreement, "Restricted Referral Source" means: (i) any entity from which the Company has received referrals with regard to its Insurance Products or Services (or any other products or services sold for fee(s) or commission(s) at the time Employee's employment with the Company ends) at any time during the Look Back Period and (ii) with whom/which Employee had dealings or contact on behalf of the Company or about whom/which Employee received any Confidential Information during the Look Back Period.

(c)    *Related Matters.*

(i)    Employee acknowledges and agrees that: (A) the Company has long-term relationships with its Client Accounts; (B) that those relationships were in many instances developed at considerable expense and difficulty to the Company over several years of close and continuing involvement and that the Company is acquiring at considerable expense the benefits and goodwill associated with such relationships; (C) the Company's investment of time, money and ingenuity in building and maintaining its clientele is entitled to protection, and that the number of Client Accounts and of Prospective

Client Accounts falling within the restrictions set forth in this **Section 6** is small in comparison to the total number of potential Persons to whom Insurance Products or Services may be transacted or provided by Employee, and does not significantly affect Employee's ability to engage in a lawful profession or business to compete fairly with Company and its Affiliates; (D) after the termination of Employee's employment with the Company, the Company shall be required to expend substantial time and resources in training and in developing and maintaining relationships between those Client Accounts previously serviced or managed by Employee, or those Prospective Client Accounts as to which Employee participated, and those Company employees designated to service and/or manage such Client Accounts or Prospective Client Accounts; and (E) Employee has carefully considered, and agrees that the Restricted Period and the provisions of this **Section 6** are fair, reasonable, and not unduly restrictive on Employee, and that Employee has had an opportunity to obtain legal advice before agreeing to these terms.

(ii)    In the event of a breach or threatened breach of any of the covenants or provisions of this **Section 6**, the Company and/or its Affiliates, as applicable, may seek temporary and permanent injunctive relief, as well as any other applicable remedies at law or in equity. Without limiting the foregoing, Employee further acknowledges and understands that, under applicable law, for the unauthorized use or disclosure of any trade secrets a court may award any of the following relief: (A) the Company's or its Affiliates' lost profits; (B) disgorgement of profits of the wrongdoer; (C) royalties; (D) an injunction; (E) punitive damages up to treble damages; and/or (F) attorneys' fees and costs.

(iii)    If the Company and/or an Affiliate pursues legal action to secure Employee's compliance with this Agreement, Employee will pay all reasonable attorneys' fees, expert witness fees, costs and expenses incurred by the Company or the Affiliate in enforcing this Agreement against Employee. The Company or the Affiliate shall be deemed the prevailing party, entitled to all of its reasonable attorneys' fees, costs and expenses, if it is awarded any part of the legal or equitable relief it seeks, irrespective of whether some of the relief it seeks is denied or modified. If under applicable law, the foregoing cannot be enforced without also giving Employee the right to recover attorneys' fees and costs if deemed the prevailing party, then the foregoing sentence shall not apply and both parties shall bear their own attorney's fees and costs instead.

(iv)    Employee acknowledges that the purposes of this **Section 6** would be frustrated by measuring the period of restriction from the date of termination of employment where Employee failed to honor the Agreement until directed to do so by court order. Therefore, should legal proceedings have to be brought by the Company and/or its Affiliates against Employee to enforce this Agreement, the period of restriction under this **Section 6** shall be deemed to be extended for a period equal to the period of violation by Employee; provided, however, this extension of time shall be capped so that the extension of time does not exceed two years from the date Employee's employment ended, and if this extension would make the restriction unenforceable under applicable law it will not be applied.

(v)    The provisions of this **Section 6** shall be independent of any and all other covenants and provisions of this Agreement, including each other, and each shall be considered a separate and severable obligation. The alleged or perceived existence of any claim or cause of action of the Employee against the Company, whether predicated on this Agreement or some other basis, shall not relieve Employee of Employee's obligations under this Agreement and shall not constitute a defense to the enforcement by the Company of the restrictions and covenants contained in this Agreement.

(vi)    It is the intention of the Parties that the terms and provisions of this Agreement be enforceable to the maximum extent permitted by applicable law. In furtherance of the foregoing, the Parties further agree that if a court of competent jurisdiction declares any of the covenants or provisions set forth in this **Section 6** unenforceable, then, unless prohibited by law, such court shall be authorized to modify such covenants or provisions (such as to time, scope of activity and geography) so as to render the remaining covenants and the modified covenants valid and enforceable to the maximum extent possible, and as so modified, to enforce this Agreement in accordance with its terms. In accordance with the foregoing, if any provision of this **Section 6** shall be held to be excessively broad, unless prohibited by

law, it shall be deemed to be limited to the extent necessary to comply with applicable law. If any of the provisions of this Agreement shall otherwise contravene or be determined to be invalid or unenforceable under the laws of any state, country or other jurisdiction in which this Agreement may be applicable, valid, and enforceable but for such contravention or invalidity or unenforceability, and such court refuses to modify or limit such provision to make it valid and enforceable, then (A) such contravention or invalidity or unenforceability (1) shall not invalidate or otherwise affect the enforceability of all of the provisions of this Agreement, but rather (2) this Agreement (or the remaining provisions hereof, as applicable) shall be construed, insofar as the laws of that state or other jurisdiction are concerned, as not containing the provision or provisions contravening or invalid under the laws of that state or jurisdiction, and (B) the rights and obligations created hereby shall be construed and enforced to the maximum extent permitted under applicable law.

(vii)    Employee agrees that if Employee accepts new employment within two (2) years of leaving the Company's employ for any reason, Employee will give written notice to the new employer of Employee's post-employment obligations under this Agreement and provide a copy of such notice to the Company and Employee authorizes the Company to communicate directly to such new employer the post-employment obligations of Employee under this Agreement, and Company shall be entitled to do so directly including a copy of this **Section 6** in the event Employee fails to do so. Nothing in this Agreement shall be construed to prohibit Employee from engaging in business ventures that are not competitive with the Company and its Affiliates after the Employee's employment with the Company ends.

7.    **Creations/Images**.  Employee irrevocably assigns, to the extent permitted by law, to the Company all rights, title and interest in and to all work performed, and all materials, creations, designs, technology, discoveries, inventions, ideas, and other subject matter conceived, developed or created by Employee, alone or with others, during the period of Employee's employment with the Company, pertaining to the Insurance Business, regardless of whether or not such subject matter is protectable by copyright, trade secret, patent, trademark and other intellectual property rights ("Creations"). Creations shall be deemed works made for hire, and all rights, title and interest in and to Creations shall vest automatically in the Company.  Employee agrees to execute all documents necessary or appropriate for the use by the Company in applying for, obtaining and enforcing any rights regarding Creations as the Company may desire, together with any assignments thereof to the Company. If the Employee fails to execute such documents, then Employee does hereby irrevocably appoint the Company as its attorney in fact to so execute in Employee's name. Employee also hereby irrevocably and unconditionally grants Company the right to use Employee's image in advertising and marketing materials in print and/or other media should Company be desirous of doing so, without payment of any compensation to Employee, and such rights shall survive any termination of Employee's employment hereunder.

This Agreement's assignment provisions are limited to only those inventions that can be lawfully assigned by an employee to an employer.  Some examples of state laws limiting the scope of assignable inventions are: Delaware Code Title 19 Section 805; Kansas Statutes Section 44-130; Minnesota Statutes 13A Section 181.78; Nevada Stat. § 600.500; New Jersey Rev. Stat. §34:1B-265; North Carolina General Statutes Article 10A, Chapter 66, Commerce and Business, Section 66-57.1; Utah Code Sections 34-39-l through 34-39-3, "Employment Inventions Act"; Washington Rev. Code, Title 49 RCW:  Labor Regulations, Chapter 49.44.140. NOTICE: Employee acknowledges notice that to the extent one of the foregoing laws applies, the invention assignment agreement will not apply to an invention for which no equipment, supplies, facility or trade secret information of the Company or its Affiliates was used and which was developed entirely on their own time, unless: (1) the invention relates directly to the business of the Company or any of its Affiliates or to the Company's or any of its Affiliates' actual or demonstrably anticipated research or development; or (2) the invention results from any work performed by Employee for the Company. Similarly, to the extent California Labor Code Section 2870, or Illinois 765 ILCS 1060/1-3, "Employee Patent Act", controls then the same notice will apply absent the word "directly" in part (1).

8.    **No Conflicts or Use of Non-Company Confidential Information**. Employee represents that their performance of all the terms of this Agreement does not and will not breach any agreement they

have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by Employee in confidence or in trust prior to or during their employment. Employee will not disclose to the Company or any of its Affiliates or use in the course of their employment any inventions, confidential or non-public proprietary information or material belonging to any previous employer or any other party. Employee will not incorporate or induce the Company or its Affiliates to use any inventions, confidential or non- public proprietary information, or material belonging to any previous client, employer or any other party.

9.      **Waivers and Modifications**.   No waiver, failure to strictly enforce or modification of this Agreement or of any covenant, condition, or limitation in this Agreement shall be valid unless in writing and duly executed by the Party to be charged therewith, and no evidence of any waiver or modification shall be offered or received in evidence in any proceeding, arbitration, or litigation between the Parties hereto arising out of or affecting this Agreement, or the rights or obligations of the Parties hereunder, unless such waiver or modification is in writing, duly executed as aforesaid, and the Parties further agree that the provisions of this section may not be waived except as herein set forth.

10.     **Notices**.  Notices shall be addressed as indicated below, or to such other addressee or to such other address as may be designated by either Party:

If to the Company:

Brown & Brown Insurance Services, Inc.
c/o Brown & Brown, Inc.
300 North Beach Street
Daytona Beach, FL 32114
Attention: Legal Department
E-mail: legal.notice@bbins.com

If to Employee:

To the most current residence address on file with the Company.

11.     **Amendment.**  Unless this Agreement provides otherwise, this Agreement cannot be altered, amended, changed, or modified in any respect or particular unless each such alteration, amendment, change, or modification shall have been agreed to by each of the Parties hereto and reduced to writing in its entirety and signed and delivered by each Party.

12.     **Assignment and Enforcement**.  Employee agrees that the Company may freely assign this Agreement, and/or any rights hereunder, including to any Affiliate or to any entity. Further, to the extent applicable, the Company's Affiliates shall be deemed third-party beneficiaries and may enforce the applicable rights and obligations of this Agreement. Employee acknowledges that during their employment they may provide services to, or acquire Confidential Information about, entities within the Brown & Brown, Inc., family of companies beyond the entity which employs them at the time they enter into this Agreement, or Employee may become employed by one of those companies. Accordingly, this Agreement shall inure to the benefit of such entities, and Employee further agrees to be bound by the provisions of this Agreement for benefit of the Company or any subsidiary or Affiliate thereof to whose employ Employee may be transferred, without the necessity that this Agreement or another employment agreement be re-executed at the time of such transfer. No assignment, consent by Employee, or notice to Employee shall be required to render this Agreement enforceable by any assignee, transferee or other entity designated by the Company. The Company's assignees or successors are expressly authorized to enforce the Company's rights and privileges hereunder, including without limitation the restrictive covenants set forth in **Section 6**. Employee may not assign or delegate Employee's rights or obligations hereunder in whole or in part without the Company's prior written consent. Subject to the foregoing, this Agreement shall be binding

upon and inure to the benefit of Employee's heirs, executers and administrators and the Parties' respective successors and assigns.

13. **WAIVER OF JURY TRIAL. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION RELATED TO OR ARISING OUT OF, UNDER OR IN CONJUNCTION WITH THIS AGREEMENT, EMPLOYEE'S EMPLOYMENT WITH THE COMPANY, AND/OR THE TERMINATION OF EMPLOYEE'S EMPLOYMENT WITH THE COMPANY. THE PARTIES UNDERSTAND AND AGREE THAT, BY SIGNING THIS AGREEMENT, ANY LAWSUIT RELATING TO EMPLOYEE'S EMPLOYMENT, OR THE TERMINATION THEREOF, WHICH CURRENTLY EXIST OR MAY ARISE IN THE FUTURE, WILL BE HEARD AND DECIDED BY A JUDGE, RATHER THAN A JURY AND THAT THE PARTIES EXPRESSLY AGREE TO WAIVE ANY RIGHT THAT THEY OTHERWISE MAY HAVE TO A TRIAL BY JURY, UNLESS OTHERWISE PROHIBITED BY LAW. THE PARTIES RETAIN ALL OTHER SUBSTANTIVE AND PROCEDURAL RIGHTS, EXCEPT THE RIGHT TO A JURY TRIAL, UNLESS OTHERWISE PROHIBITED BY LAW.**

14. **Governing Law**. The laws of the state in which the Employee last regularly resided and worked for the Company shall apply to the interpretation of and disputes arising out of this Agreement, and if Employee primarily works in a different state from where Employee primarily resides, Employee's primary state of residence when last working for the Company shall govern. The non-solicitation covenants in **Section 6(b)** shall not apply in California post-employment. Employee acknowledges that portions of this Agreement (including Sections 6, 7 and 13) may be modified or overridden by the laws of the state in which Employee last regularly resided and worked, and that these modifications or overrides are set forth in Appendix A hereto, which constitutes part of the Agreement.

15. **Miscellaneous**. The waiver of or failure to strictly enforce any breach of any provision of the Agreement by Employee, on the one hand, or the Company or, if applicable, its Affiliates, on the other hand, shall not operate or be construed as a waiver of any subsequent breach by the other Party. This Agreement constitutes the entire agreement, and supersedes all prior employment agreements or other agreements and understandings, both written and oral, among the Parties, with respect to the subject matter hereof. Any prior agreement between the Parties or their respective affiliates with respect to the subject matter hereof shall be of no further force and effect, and to the extent of any such prior agreements, this Agreement shall be deemed a novation, good and sufficient consideration for which is acknowledged by all Parties hereto. Notwithstanding the foregoing, if Employee was a Party to any employment, non-competition, non-piracy, non-solicitation or confidentiality agreement with any Affiliate of the Company immediately prior to Employee's employment with the Company, nothing in this Agreement shall waive or release Employee's post-separation obligations arising under such agreement. To the extent any conflict exists between the restrictions set forth in the Agreement and the restrictions set forth in any other agreement between Employee and the Company or any Affiliate providing for similar restrictions, the Company and its Affiliates shall be provided the greatest protection set forth in either agreement. This Agreement may be executed in counterparts, all of which together shall comprise one and the same instrument.

16. **Protected Conduct**. Nothing in this Agreement prohibits Employee from (i) opposing an event or conduct that Employee reasonably believes is a violation of law, including criminal conduct, discrimination, harassment, retaliation, a safety or health violation, or other unlawful employment practices, (ii) disclosing sexual assault or sexual harassment; or (iii) reporting such an event or conduct to my attorney, law enforcement, or the relevant law-enforcement agency (such as the Securities and Exchange Commission, Department of Labor, Occupational Safety & Health Administration, Equal Employment Opportunity Commission, the state division of human rights, or a local commission on human rights), or (iv) making any truthful statements or disclosures required by law or otherwise cooperating in an investigation conducted by any government agency (collectively referred to as "Protected Conduct"). Further, nothing requires notice to or approval from the Company before engaging in such Protected Conduct. Protected Conduct may include a disclosure of trade secret information that complies with the

restrictions in the Defend Trade Secrets Act of 2016 (DTSA). *The DTSA provides that no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret that: (i) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public. It also provides that an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal and does not disclose the trade secret except as permitted by court order.*

17.    **Negotiation of Agreement.**    This Agreement has been negotiated by the Parties hereto, each having had the opportunity to be represented by counsel of its choice, and no provision hereof shall be construed against any Party by reason of that Party being considered to be the drafter of such provision. Employee represents that Employee has read this Agreement carefully and understands this Agreement or has relied exclusively on Employee's counsel for an understanding of the terms and conditions herein.

18.    **Effectiveness**.    This Agreement shall be effective on the Effective Date, <u>provided</u> that its effectiveness shall be conditioned upon the completion of the Acquisition.

19.    **Termination of Prior Agreement**.    Employee acknowledges and agrees, by Employee's execution and delivery of this Agreement (but subject to the closing of the Acquisition): (a) this Agreement replaces and supersedes any oral or written employment agreement or similar arrangement between Employee and Sellers (as applicable, "<u>Prior Agreement</u>"); (b) any Prior Agreement is hereby terminated; (c) Employee hereby fully waives, releases, remises, acquits and forever discharges, on behalf of Employee and Employee's heirs, executors, attorneys, administrators, agents, successors and assigns, any right of Employee under any Prior Agreement or otherwise to acquire from Sellers or their respective successors and assigns (including, without limitation, the Company) any equity interest in any client accounts of Sellers; <u>provided</u>, however, that nothing in this **Section 19** shall be deemed or construed as a waiver or release by Employee of any compensation, bonuses or employee benefits that have accrued but remain unpaid to Employee as of the date of Employee's execution of this Agreement.

\* \* \* \* \* \* \* \* \*

**[Remainder of Page Intentionally Left Blank – Signature Page Follows]**

**IN WITNESS WHEREOF.** the Parties have executed this Employment Agreement as of the date first written above.

**EMPLOYEE**                                    **BROWN & BROWN INSURANCE SERVICES. INC.**

**Westvn Swenson**

By: _____

    **Erik Templin.** *Profit Center Leader*

APPENDIX

The following shall apply to modify provisions of the Agreement, where applicable, based upon the controlling law in the state where I (Employee) primarily reside when last employed by the Company:

LIMITATION ON NON-SOLICITATION: Employee recognizes and acknowledges that Client Accounts, Prospective Client Accounts, Restricted Key Relationships, Restricted Person and Restricted Referral Sources are not confined to any geographic area. Therefore, Employee acknowledges and understands that there is no geographic restriction that applies to the non-solicitation covenant contained in **Sections 6(b)** and that the scope of these covenants are appropriately limited by the customer-based, key relationship-based, employee or independent-contractor-based, or referral-source based restriction. However, to the extent additional geographic limitations are required to make the restrictions in **Section 6(b)** enforceable, they shall be deemed limited to the: (a) the state in which I (Employee) primarily resided when last employed by the Company; and (b) the states in which the Restricted Client Accounts are located ("Restricted Area").

ALABAMA. If Alabama law controls, then: (a) the definition of "Restricted Person" will be modified to be further limited to those employees of the Company who are in a position uniquely essential to the management, organization, or service of the business (such as an employee involved in management or significant client sales or servicing); (b) the Client Non-Solicit Obligations shall not apply to Prospective Client Accounts; and (c) the Restricted Period shall be reduced to a period of eighteen (18) months following the Termination Date.

ARKANSAS. If Arkansas law controls, then the following applies to Employee: the jury waiver in **Section 13** shall not apply.

CALIFORNIA. If California law controls, then the following applies to Employee: (a) the Client Non-Solicit Obligations, Key Relationship Non-Interference Obligations, and Restricted Person Non-Solicit Obligations in **Sections 6(a) and (b)** shall not apply after Employee's employment with the Company (or any Affiliate) ends. However, any conduct relating to the solicitation of Company's or Affiliates' Client Accounts or employees that involves the misappropriation of the Company's or an Affiliate's trade secret information, such as its protected client information, will remain prohibited conduct at all times, and nothing in this Agreement shall be construed to limit or eliminate any rights or remedies the Company or its Affiliates would have against Employee under trade secret law, unfair competition law, or other laws applicable in California absent this Agreement; (b) In addition to the other forms of Protected Conduct, nothing in the Agreement shall be construed to prohibit Employee from disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that I have reason to believe is unlawful; (c) Further, **Section 6(c)(iii)** shall be replaced with the following language: "In the event that the Company or its Affiliate is successful in securing any temporary, preliminary, and/or permanent injunctive relief, and/or an award of damages or other judicial relief against Employee in connection with any breach of this Agreement, Employee agrees that the Company or its Affiliate shall also be entitled to recover all remedies that may be awarded by a court of competent jurisdiction or arbitrator and any other legal or equitable relief allowed by law"; and (d) the jury waiver in **Section 13** shall not apply.

COLORADO. If Colorado law controls, then the following applies to Employee:

(a)    **Client Non-Solicit Obligations and Key Relationship Non-Interference Obligations**. If Employee does not earn an amount of annualized cash compensation equivalent to or greater than the threshold amount for highly compensated workers, $112,500 (or the earnings threshold in effect as adjusted annually after August 10, 2022, by the Colorado Division of Labor Standards and Statistics in the Department of Labor and Employment), then nothing in the Client Non-Solicit Obligations shall restrict Employee from accepting business from a Restricted Client Account so long as the Employee did not solicit,

assist in soliciting, facilitate the solicitation of, provide, or offer to provide services to the Restricted Client Account (regardless of who first initiated contact) or use Confidential Information to encourage or induce the Restricted Client Account to withdraw, curtail or cancel its business with the Company or any Affiliate or in any other manner modify or fail to enter into any actual or potential business relationship with the Company or any Affiliate. If Employee does not earn an amount of annualized cash compensation equivalent to or greater than sixty-percent of the threshold amount for highly compensated workers, $67,500 (or the earnings threshold in effect as adjusted annually after August 10, 2022, by the Colorado Division of Labor Standards and Statistics in the Department of Labor and Employment)("Colorado Client Non-Solicit Earnings Threshold"), then the Client Non-Solicit Obligations and Key Relationship Non-Interference Obligations in **Section 6(b)(i) through (iii)** shall not apply after Employee's employment with the Company (or any Affiliate) ends.

The definition of "Restricted Client Account" and "Restricted Prospective Client Account" shall be modified to cover only those Client Accounts or Prospective Client Accounts with respect to which Employee would have been provided trade secret information during the Look Back Period. Employee stipulates that the Client Non-Solicit Obligations and Key Relationship Non-Interference Obligations in **Sections 6(b)(i) through (iii)** are reasonable and necessary for the protection of trade secrets within the meaning § 8-2-113(2)(b) (the "Colorado Noncompete Act").

(b) **Notice**. Employee acknowledges that they received notice of the covenant not to compete and its terms before Employee accepted an offer of employment, or, if a current employee at the time Employee enters into this Agreement, at least fourteen (14) days before the earlier of the effective date of the Agreement or the effective date of any additional compensation or change in the terms or conditions of employment that provides consideration for the covenant not to compete.

(c) **Protected Conduct**. In addition to the other forms of Protected Conduct, nothing in the Agreement prohibits disclosure of information that arises from the worker's general training, knowledge, skill, or experience, whether gained on the job or otherwise, information that is readily ascertainable to the public, or information that a worker otherwise has a right to disclose as legally protected conduct. Further, nothing in this Agreement or Company policy limits or prevents a worker from disclosing information about workplace health and safety practices or hazards. Further, in addition to the other forms of Protected Conduct, nothing in the Agreement shall be construed to prohibit Employee from disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Employee has reason to believe is unlawful.

**DISTRICT OF COLUMBIA**. If Employee performs a majority of their work in the District of Columbia or is based in District in Columbia and does not perform the majority of their work in any other jurisdiction, then the Agreement will be modified as follows: nothing in this Agreement or any Company (or Affiliate) policy restricts Employee from having additional employment or contract work in addition to their employment with the Company (or any Affiliate) so long as the employment or work does not violate Employee's duty of loyalty or create a conflict of interest and would not result in the employee's disclosure or use of Confidential Information. Employee shall notify the Company's Team Resources in writing prior to accepting any such additional employment or contract work so the Company may determine whether such employment violates or would likely violate this **D.C. section of the Appendix**.

**GEORGIA**. If Georgia law controls, then the following applies to Employee: (a) the definition of Confidential Information will be understood to exclude information voluntarily disclosed to the public by the Company or its Affiliates (excluding unauthorized disclosures by Employee or others), information that is the result of independent development by others, and information that is otherwise available in the public domain through lawful means; (b) Employee understands the Restricted Person Non-Solicit Obligations, Referral Source Non-Interference Obligations and the Key Relationship Non-Interference Obligations are

limited to the Restricted Area (defined above); (c) Nothing in this Agreement, including the definition of Confidential Information, limits or alters the definition of what constitutes a trade secret under any federal or state law designed to protect trade secrets. In addition, nothing in the Client Non-Solicit Obligations in **Sections 6(b)(i) and (ii)** shall restrict Employee from accepting business from a Restricted Client Account or Restricted Prospective Client Account so long as the Employee did not solicit, assist in soliciting, facilitate the solicitation of, provide, or offer to provide services to the Restricted Client Account or Restricted Prospective Client Account (regardless of who first initiated contact) or use Confidential Information to encourage or induce the Restricted Client Account or Restricted Prospective Client Account to withdraw, curtail or cancel its business with the Company or in any other manner modify or fail to enter into any actual or potential business relationship with the Company; and (d) the jury waiver in **Section 13** shall not apply.

**ILLINOIS.** If Illinois law controls, then the following applies to Employee: (a) the Client Non-Solicit Obligations, Key Relationship Non-Interference Obligations, and Restricted Person Non-Solicit Obligations in **Section 6(b)** shall not apply if Employee earns equal or less than $45,000 annually ("Illinois Non-Solicit Earnings Threshold")(with the Non-Solicit Earnings Threshold increasing by $2,500 every five years from January 1, 2027 through January 1, 2037). Employee further agree that if, at the time Employee signs the Agreement, Employee's earnings do not meet the Illinois Non-Solicit Earnings Threshold, then the Client Non-Solicit Obligations, Key Relationship Non-Interference Obligations, and Restricted Person Non-Solicit Obligations in **Section 6** will automatically become enforceable against Employee if and when Employee begins earning an amount equal to or greater than the Illinois Non-Solicit Earnings Threshold; (b) In addition, Employee acknowledges they received a copy of the Agreement at least 14 calendar days before the effective date; and (c) **Section 6(c)(iii)** shall be replaced with the following language: "In the event that any action is filed to enforce the terms and conditions of **Section 6** of this Agreement, the prevailing party in the action will recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees and costs. The Company or its Affiliate shall be deemed the prevailing party if it is awarded any part of the legal or equitable relief it seeks, irrespective of whether some of the relief it seeks is denied or modified."

**INDIANA.** If Indiana law controls, then the following applies to Employee: the definition of "Restricted Person" shall be modified to be further limited to those employees who have access to or possess any Confidential Information that would give a competitor an unfair advantage.

**LOUISIANA.** If Louisiana law controls, then the following applies to Employee: (a) the meaning of Employee's "Restricted Area" shall be understood to include the parishes (and equivalents) in the following list so long as Company or any of its Affiliates continues to carry on business therein:  Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, Desoto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson Davis. Jefferson, Lafayette, Lafourche, LaSalle, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John the Baptist, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermillion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana, Winn;  Cass, Marion, Harrison, Panola, Shelby, Sabine, Newton, Orange, and Jefferson counties in Texas; Miller, Lafayette, Columbia, Union, Ashley and Chicot counties in Arkansas; and Issaquena, Warren, Clairborne, Jefferson, Adams, Wilkinson, Amite, Pike, Walthall, Marion, Pearl River and Hancock counties in Mississippi; and (b) Employee's Client Non-Solicit Obligations and Key Relationship Non-Interference Obligations in **Sections 6(b)(i) through (iii)** shall be limited to the parishes and counties (or their equivalents) from the foregoing lists that fall within Employee's Restricted Area.  Employee agrees that the foregoing provides Employee with adequate notice of the geographic scope of the restrictions contained in the Agreement by name of specific parish or parishes (and equivalents), municipality or municipalities, and/or parts thereof.

**MINNESOTA**. If Minnesota law controls and Employee is entering into this Agreement in connection with the start of their employment with the Company, Employee acknowledges that they were provided with notice of this Agreement when offered employment and were aware that execution of an agreement with non-solicit restrictions was a requirement of employment when they accepted the Company's or its Affiliate's offer. In addition, the Referral Source Non-Interference Obligations and the Key Relationship Non-Interference Obligations shall not apply after Employee's employment with the Company ends.

**MISSOURI**. If Missouri law controls, then the following applies to Employee: the definition of "Restricted Person" is modified to exclude from its definition any employee who provides only secretarial or clerical services.

**MONTANA.** If Montana law controls, then the following applies to Employee: the at-will employment provision in **Section 4(a)** and the jury waiver in **Section 13** shall not apply.

**NEBRASKA**. If Nebraska law controls, then the following applies to Employee: (a) the definition of "Restricted Client Account" is modified so that it means any persons or entities with which Employee, alone or in combination with others, handled, serviced or solicited at any time during the Look Back Period; and (b) the Referral Source Non-Interference Obligations and the Key Relationship Non-Interference Obligations shall not apply after Employee's employment with the Company ends.

**NEW JERSEY.** If New Jersey law controls, then the following applies to Employee: the jury waiver in **Section 13** shall not apply to any claims brought under Conscientious Employee Protection Act ("CEPA") or the New Jersey Law Against Discrimination ("LAD").

**NEW YORK**. If New York law controls, then the following applies to Employee: the definition of "Restricted Client Account" is modified to exclude from its definition those Client Accounts who became a Client Account as a result of Employee's independent contact and business development efforts with the Client Account prior to and independent from their employment with Company.

**NEVADA**. If Nevada law controls, then the following applies to Employee: **Sections 6(b)(i) and (ii)** do not preclude Employee from providing services to any former client or customer of the Company if: (i) Employee did not solicit the former customer or client; (ii) the customer or client voluntarily chose to leave and seek services from Employee; and (iii) Employee is otherwise complying with the limitations in this Agreement as to time, geographical area and scope of activity to be restrained.

**NORTH CAROLINA**. If North Carolina law controls, then the following applies to Employee: (a) the Look Back Period shall be calculated looking back one year from the date the employment with the Company (or any Affiliate) ends or two years from the date of enforcement and not from the date employment ends, whichever provides the Company or its Affiliates the greatest protection and is enforceable under applicable law; (b) Employee understands the Client Non-Solicit Obligations, Restricted Person Non-Solicit Obligations, Referral Source Non-Interference Obligations and the Key Relationship Non-Interference Obligations are limited to the Restricted Area (defined above); and (c) the jury waiver in **Section 13** shall not apply.

**NORTH DAKOTA**. If North Dakota law controls, then the following applies to Employee: the Client Non-Solicit Obligations and Key Relationship Non-Interference Obligations in **Sections 6(b)(i) through (iii)** shall not apply after Employee's employment with the Company (or any Affiliate) ends. However, any conduct relating to the solicitation of Company's Client Accounts or employees that involves the misappropriation of the Company's or any Affiliate's trade secret information, such as its protected client information, will remain prohibited conduct at all times.

**OKLAHOMA**. If Oklahoma law controls, then the following applies to Employee: the Client Non-Solicit Obligations shall all be amended to provide that notwithstanding anything in it to the contrary, Employee shall be permitted to engage in the same business as that conducted by Company or its Affiliates or in a similar business as long as Employee does not directly solicit the sale of goods, services or a combination of goods and services from the established clients of the Company or its Affiliates; and the jury waiver in **Section 13** shall not apply.

**SOUTH CAROLINA**. If South Carolina law controls, then the following applies to Employee: Employee understands the Client Non-Solicit Obligations, Restricted Person Non-Solicit Obligations, Referral Source Non-Interference Obligations and the Key Relationship Non-Interference Obligations are limited to the Restricted Area (defined above).

**VIRGINIA**. If Virginia law controls, then the following applies to Employee: (a) Employee and the Company agree that the non-solicit obligations are reasonably limited in nature and do not prohibit employment with a competing business in a non-competitive position; and (b) if Employee's average weekly earnings calculated as provided for under Code of Virginia §    7 (the "Virginia Act"), are less than the average weekly wage of the Commonwealth as determined pursuant to subsection B of §65.2-500 or Employee otherwise qualifies as a "low-wage employee" under the Virginia Act then the nothing in the Client Non-Solicit Obligations in **Sections 6(b)(i) and (ii)** shall restrict Employee from providing a service to a client of the Company or any Affiliate if Employee does not initiate contact with or solicit the client. Employee shall not be considered a "low-wage employee" if Employee's earnings are derived, in whole or in predominant part, from sales commissions, incentives, or bonuses paid to the employee by the Company (or any Affiliate).

**WASHINGTON**. If Washington law controls, then the following applies to Employee:

    (a)    The Restricted Period shall be reduced to a period of eighteen (18) months following the Termination Date.

    (b)    Unless Employee earns from the Company at least $116,594 in Box 1 W-2 annual compensation, as adjusted annually for inflation by the Washington State Department of Labor & Industries ("Washington Earnings Threshold"), after Employee's employment with the Company ends:

    (1) the Client Non-Solicit Obligations in **Sections 6(b)(i) and (ii)** are modified to only prohibit solicitation by Employee of any Restricted Client Account to cease or reduce the extent to which it is doing business with the Company or an Affiliate, in accordance with the definition of a "Non-solicitation agreement" under the Washington Act (Rev. Code of Wash. (RCW) §§    - 900);

    (2) the Key Relationship Non-Interference Obligations and Referral Source Non-Interference Obligations in **Section 6(b)(iii) and (v)** shall not apply after Employee's employment with the Company (or any Affiliate) ends; and

    (3) the Restricted Person Non-Solicit Obligations in **Section 6(b)(iv)** are modified to only prohibit solicitation by Employee of any Restricted Person to leave their employment with the Company or any Affiliate, in accordance with the definition of a "Non-solicitation agreement" under the Washington Act (Rev. Code of Wash. (RCW) §§    – 900.

    (c)    If, at the time Employee signs the Agreement, their earnings do not meet the Washington Earnings Threshold, then the modifications in **Sections (b)(1) through (3) of the Washington section of this Appendix** shall no longer apply and **Section 6** of the Agreement will automatically become enforceable against Employee as originally drafted if and when Employee begins earning an amount more than the Washington Earnings Threshold annually.

(d)      If Employee's employment is terminated as a result of a lay-off, the modifications in **Sections (b)(1) through (3) of the Washington section of this Appendix** shall apply unless, for the period the Company (or an Affiliate) chooses to enforce the covenants as originally drafted, the Company (or an Affiliate) provides Employee with compensation equivalent to their base salary at the time of termination, minus the amount of any compensation Employee earns through employment after the end of their employment with the Company (or any Affiliate), which Employee agrees to promptly and fully disclose. For purposes of this section, "layoff" means termination of Employee's employment by the Company or an Affiliate for reasons of the Company's of the Affiliate's insolvency or other purely economic factors, and specifically excludes termination of Employee's employment for any other reason, either with or without cause.

(e)      Nothing in this Agreement shall restrict Employee from having an additional job, supplementing their income by working for another employer, working as an independent contractor, or being self-employed if Employee does not earn at least twice the Washington minimum hourly wage, though Employee will still be subject to the common law duty of loyalty and the Company's policies regarding conduct.

(f)      In addition to the other forms of Protected Conduct, nothing in the Agreement prohibits disclosure or discussion of conduct Employee reasonably believes to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy.

(g)      If entering into this Agreement in connection with the start of their employment with the Company, Employee acknowledges and agrees that Employee has the opportunity to review and consider the terms of the Agreement, including this Appendix, before accepting an offer of employment with the Company. If entering into this Agreement after the commencement of employment, Employee acknowledges they received independent consideration for the covenants in this Agreement and had sufficient advance notice to consider this Agreement before accepting it.

**WISCONSIN**. If Wisconsin law controls, then the following applies to Employee: (a) **Section 6(c)(iv)** shall not apply; (b) the definition of "Restricted Person" is modified to be further limited to those employees are either entrusted with Confidential Information or employed in a position essential to the management, organization, or service of the business (such as, but not limited to maintaining Company's client relationships); and (c) the Client Non-Solicit Obligations shall not apply to Prospective Client Accounts.

Exhibit E



Brown & Brown, Inc.
300 North Beach Street
Daytona Beach, FL 32114
Fax: (386) 239-7293

Direct Line: (386) 239-5726 ▪ (800) 877-2769 Ext. 5726
Direct Fax: (386) 239-7293

ERIKA J. BARGER
*Litigation Counsel*

July 29, 2024

**<u>Via Certified Mail (Return Receipt Requested) and U.S. Mail</u>**

Matthew Cooper
1610 Karen Lane
Iowa Park, TX 76367

   Re:  Compliance with Employment Agreement

Dear Ms. Crawley:

   It is my understanding that you have left your employment with Brown & Brown Insurance Services, Inc., a subsidary of Brown & Brown Inc., (the "Company"), and have joined a competitor, Nathan Gilbert Insurance Agency, a branch of Legacy Insurance Group.

   It has come to my attention that you may be violation of certain covenants relating to your Employment Agreement that you executed on March 1, 2024, (the "Agreement"). Specifically, you are in violation of the covenants under Section 6, (b) (i), relating to Confidential Information: Covenant Not to Solicit or Service Client Accounts or Prospective Client Accounts; Covenant Not to Solicit Employees; Non-Interference; Related Matters.

   Your Agreement does not prohibit you from working for a competitor or from selling insurance. It simply prohibits you from, directly or indirectly, soliciting, hiring, engaging, or seeking to induce any of the Company's employees to terminate such employee's employment with the Company for any reason, including, without limitation, to work for you or any competitor of the Company for two (2) years immediately following termination of your employment with the Company. Thus, it permits you to remain in the insurance agency business after the termination of your employment, while at the same time, protecting the business, goodwill, and confidential information belonging to the Company.

   Additionally, the Agreement prohibits you, during the same two-year period, from, using or disclosing any Confidential Information (as defined in Agreement) to solicit or divert any Client Account or Prospective Client Account that you either had some involvement in proposing, quoting, selling, placing, providing, servicing, or renewing Insurance Products or Services or about whom you received any Confidential Information.

Matthew Cooper
July 29, 2024
Page 2 of 2

We expect you to honor the terms of your Agreement. Similarly, we expect that your employer will refrain from acquiring, much less using, any confidential or proprietary information that you may have acquired or had access to during your employment with the Company. In case you did not retain a copy of the Agreement, enclosed is a copy so that you may familiarize yourself with the referenced provisions as well as the other provisions relating to your post-employment activities.

If you do not immediately cease and desist from further violations of your Agreement, the Company intends to pursue all legal and equitable remedies against both you and your employer. Nothing herein should be a waiver of the Company's right to pursue legal or equitable remedies for violations of your Agreement which have already occurred.

As a courtesy to you and your new employer, we have copied this letter to Nathan Gilbert, Owner of Nathan Gilbert Insurance Agency, and to Heath Barnett, CEO of Legacy Insurance Group, so they will be in the best position to support you in complying with your post-employment obligations. We hope that Nathan Gilbert Insurance Agency and Legacy Insurance Group also value and respect the importance of honoring and enforcing restrictive covenants like these. Should you have questions about the scope of your post-employment obligations, we also recommend that you share this letter and discuss its implications with your personal counsel.

Sincerely,

/s/ *Erika J. Barger*

Erika J. Barger

EJB:cg

cc: Nathan Gilbert, Nathan Gilbert Insurance Agency
    Heath Barnett, CEO, Legacy Insurance Group

Enc

Matthew Cooper
July 29, 2024
Page 2 of 2

Nathan Gilbert, Owner
Nathan Gilbert Insurance Agency
315 N. Wall Street
Iowa Park, TX 76367

Heath Barnett, CEO
Legacy Insurance Group
420 Commerce Street NW
Childress, TX 79201

# Exhibit F



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #:** ▮▮▮▮▮▮ **08/12/2024
Document #:** ▮▮▮▮▮▮
**Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Swenson Insurance Group LLC

### Article 2 – Registered Agent and Registered Office

☐A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Westyn    Swenson**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**4957 US 82 W    Nocona  TX  76255**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

**OR**

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐A. The limited liability company is to be managed by managers.

**OR**

☑B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Managing Member 1: (Business Name) **Swenson Capital, LLC**

Address: **4957 US 82 W    Nocona  TX, USA  76255**

Managing Member 2: **Westyn    Swenson**      Title: **Managing Member**

Address: **4957 US 82 W    Nocona  TX, USA  76255**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

## Initial Mailing Address

Address to be used by the Comptroller of Public Accounts for purposes of sending tax information.

The initial mailing address of the filing entity is:

**4957 US 82 W**
**Nocona, TX 76255**
**USA**

## Organizer

The name and address of the organizer are set forth below.

**Westyn Swenson**        <u>**4957 US 82 W Nocona TX 76255 USA**</u>

## Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Westyn Swenson**

Signature of Organizer

**FILING OFFICE COPY**